HARDEN, In re. See Case No. 6,048.

———

## Case No. 6,047.
### HARDEN v. GORDON et al.
[2 Mason, 541.][1]

Circuit Court, D. Maine. Oct. Term, 1823.

SEAMEN—SICKNESS—EXPENSES.

1. The expenses of curing a sick seaman in the course of the voyage is a charge on the ship by the maritime law; and in this charge are included not only medicines and medical advice, but nursing, diet, and lodging, if the seaman be carried ashore.

[Cited in Lamson v. Westcott, Case No. 8,-035. Followed in Reed v. Canfield, Id. 11,-641. Cited in The George, Id. 5,329; Reed v. Hussey, Id. 11,646; Freeman v. Baker, Id. 5,084; The Forest, Id. 4,936; The Atlantic, Id. 620; Callon v. Williams, Id. 2,-324; Brown v. The D. S. Cage, Id. 2,002; Brown v. The Bradish Johnson, Id. 1,992; Peterson v. The Chandos, 4 Fed. 651; Longstreet v. The R. R. Springer, Id. 672; The A. Heaton, 43 Fed. 596.

[Cited in Duncan v. Reed, 39 Me. 417; Croucher v. Oakman, 3 Allen, 189; Holt v. Cummings, 102 Pa. St. 217; Scarff v. Metcalf, 107 N. Y. 216, 13 N. E. 796.]

2. The act of congress for the regulation of seamen, &c. has not changed the maritime law, except so far as respects medicines and medical advice, when there is a proper medicine chest

and medical directions on board the vessel. The charges of nursing and lodging are not affected by the act.

[Cited in Plummer v. Webb, Case No. 11,233; Holmes v. Hutchinson, Id. 6,639; McCarty v. The City of New Bedford, 4 Fed. 830.]

3. The court of admiralty has jurisdiction to enforce the payment of these expenses by a libel, for they are in the nature of additional wages during sickness.

[Cited in Packard v. The Louisa, Case No. 10,652.]

4. A stipulation, that the seamen shall pay for medical advice and medicines, without any condition that there shall be a suitable medicine chest, &c. is void, as contrary to the policy of the act of congress.

[Cited in The Sarah Jane, Case No. 12,348; Brown v. Lull, Id. 2,018.]

5. And it seems, that no stipulation contrary to the maritime law to the injury of seamen will be allowed to stand, unless an adequate additional compensation be given to them.

[Cited in The Sarah Jane, Case No. 12,348; The Betsy & Rhoda, Id. 1,366; Joy v. Allen, Id. 7,552; The San Marcos, 27 Fed. 568; The International, 30 Fed. 377.]

[Cited in Gabrielson v. Waydell, 135 N. Y. 20, 31 N. E. 969.]

6. A receipt in full of all demands is open to inquiry and explanation. A settled account for wages, &c. is not conclusive; but it may be surcharged and falsified.

[Cited in The Cypress, Case No. 3,530; Johnson v. U. S., Id. 7,419; U. S. v. Williams, Id. 16,724; Mitchell v. Pratt, Id. 9,668; Piehl v. Balchen, Id. 11,137; Lamb v. Briard, Id. 8,010; Savin v. The Juno, Id. 12,390.]

[Cited in Briggs v. Call, 5 Metc. (Mass.) 507; Pendexter v. Carleton, 16 N. H. 490; Perry v. Harrington, 2 Metc. (Mass.) 368.]

7. The onus probandi in respect to the sufficiency of the medicine chest lies on the owner.

[Appeal from the district court of the United States for the district of Maine.]

This was a suit for subtraction of wages, brought jointly against [Joshua Gordon and another] the master and the owner of the brig Enterprize, for wages earned by the plaintiff [William Harden] as mate on a voyage described in the shipping articles to be from the port of Portland to Guadaloupe and a market, and back to a port of discharge, and to Portland. The libel also included a claim for the expenses occasioned by the sickness of the plaintiff in a foreign port in the course of the voyage; and upon the allegation subsequently given in by the respective parties, the controversy was substantially narrowed down to the consideration of the validity of this claim.

Charles S. Davies, for libellant.

Mr. Longfellow, for defendants.

STORY, Circuit Justice. Several questions have been presented at the argument for the deliberation of the court. In the first place, whether the claim be within the cognizance of a court of admiralty; so that, if it be well founded in fact, this court, sitting in admiralty, is rightfully entitled to enforce it. In the next place, supposing the court to pos-

[1] [Reported by William P. Mason, Esq.]

sess jurisdiction, whether by the general principles of maritime law, such a claim constitutes a rightful charge upon the ship, which the master and owner are compellable to defray. And lastly, if the maritime law creates such a charge, whether it has not been abolished by our own navigation laws, or in the present case displaced by the express stipulations and acts of the parties. I need scarcely say, that the masterly discussion at the bar has brought before the court all the principles and authorities, foreign as well as domestic, which bear on these interesting topics; and if the labour of arriving at a satisfactory result has not been materially diminished, it has been aided by whatever could adorn, or illustrate the matters in controversy.

Upon the first point, I do not profess to feel any real doubt. Supposing, that by the principles of law the seamen are entitled, in case of sickness, to be healed at the expense of the ship, I am of opinion, that the claim for such expense may be enforced in the court of admiralty. It constitutes, in contemplation of law, a part of the contract for wages, and is a material ingredient in the compensation for the labour and services of the seamen. The admiralty has a rightful jurisdiction over the subject of compensation of seamen for maritime services, in whatever manner or form that compensation is to be paid, if it can be reduced to money. This jurisdiction does not arise from the mere toleration or connivance of the courts of common law, as is sometimes represented; and, if true, would be a stain and disgrace to these courts, as well as to the admiralty; but it is founded in its ancient and well established jurisprudence. There never was a period, when it was not an essential attribute claimed and exercised by that venerable tribunal; and instead of troubling ourselves to find out the origin of this jurisdiction, it would be more useful to inquire, how, except by subtleties and fictions, the courts of common law became possessed of that ample jurisdiction, which they now exercise over maritime contracts, with so much honour to themselves, and with such solid advantages to the country. It is not, because the compensation is called wages in the shipping articles, that the admiralty enforces the obligation of payment. It is because the services are maritime; and whatever constitutes the compensation and is reducible to money, or admits of equitable adjustment in pecunia numerata is decreed ex aequo et bono, as the just remuneration of those services. It is upon this ground, that the compensation of fishermen comes within the reach of the admiralty jurisdiction, although they claim specific shares in the cargo; for their share of the proceeds of the voyage are considered as in the nature of wages. See The Frederick, 5 C. Rob. Adm. S. And congress, acting upon this just view of the subject, have accordingly given to this class of mariners the full

benefit of the summary process of the admiralty. Act Cong. Feb. 16, 1792, c. 6, §§ 4, 5, [1 Stat. 231]; Act June 19, 1813, c. 2, §§ 1, 2, [3 Stat. 2]. I am aware, that Lord Stowell has declined to take cognizance of suits for shares in whaling voyages (The Sydney Cove, 2 Dods. 11); but there is not the slightest reason to suppose, that that learned judge has so acted, except in deference to the imposing force of the prohibitions of the courts of common law. What those prohibitions are, we have all learned from the reports; and one can scarcely read the case of Howe v. Napier (4 Burrows, 1944; and see, also, Buggin v. Bennett, Id. 2035), where the doctrine was very ably discussed at the bar, without feeling a secret persuasion, that Lord Mansfield followed the current of prior authority, rather than the dictates of his own superior judgment. Unless my previous impressions mislead me, a lurking doubt pervades the whole structure of his opinion. The distinction between a special agreement and the ordinary agreement, as a foundation for jurisdiction in cases of seamen's wages, has always appeared to me (I hope it may be spoken without irreverence) to be little more than solemn trifling and evasion. After the most thorough examination of all the common law authorities on the subject of admiralty jurisdiction, I feel myself constrained to say, that they stand upon no consistent or rational principle; and that jealousy, more than solid knowledge, seems to have urged to a disregard of the very learned and satisfactory expositions of the civilians. But this is not the place for a full discussion of this subject. It is sufficient to guard against the inference, that Lord Stowell has shown any approbation of the common law doctrines on this subject. His own decisions in other cases demonstrate, that he has never supposed the admiralty jurisdiction over mariners' contracts to be confined to the entertainment of suits, in which the claim is for mere wages, earned as such upon the ordinary terms of hire under the customary shipping articles. He may, for aught I know, feel his judicial conscience bound up by the controlling mandates of the superior courts of law, so as to exercise the admiralty jurisdiction only in vinculis; but I cannot persuade myself, that a mind so thoroughly imbued with the true spirit of maritime jurisprudence would, in the exercise of its own judgment, hesitate to support the consistent doctrines of his enlightened predecessors. Indeed in the very case of The Sydney Cove, 2 Dods. 11, he decreed wages for the outward voyage, although the wages accrued under a very special agreement, and the subsequent whaling voyage was incorporated into its terms, and was originally in the contemplation of the parties as a contingent enterprise. But whatever may be his opinion, until I am better informed by the highest tribunal, which I am bound to obey, I shall continue to seek for the true exposition of admiralty jurisdic-

tion in the instructive labours of admiralty judges.

In the case of The Isabella, 2 C. Rob. Adm. 241, there was a claim by the chief mate for the value of the privilege of a slave, as well as for wages, on an African voyage. It was rejected, not, because it was not within the jurisdiction of the court, but because it was not proved to be a part of the shipping articles, and rested in parol, and was thought to be inconsistent with the statutable regulations of this trade, which required the whole agreement to be in writing. This carries a pretty strong implication, that the court felt no difficulty in reaching the claim, if it had stood in the text of the contract. In The Madonna D'Idra, 1 Dods. 37, where a claim was made on behalf of Greek sailors for subsistence after their discharge from the ship, as well as for antecedent wages, the court did not hesitate to decree it. "It is," said the learned judge on that occasion, "wages paid in another form, it is part of the compensation for their labour; and according to the law of the country, to which these men belong, subsistence in the intermediate time must be presumed to form part of the contract for the payment of wages." In what respect does subsistence in case of a discharge differ from additional subsistence in case of sickness? To use the language of the court, it is but "wages in another form," additional wages to meet additional expenses, and constituting, if the maritime law and usage uphold the claim, a part of the contract. In the same case an allusion was made to some cases of American seamen, then recently before the court, where the three months' additional wages allowed by the act of congress of 1803, c. 62 [2 Story's Laws, 883; 2 Stat. 203, c. 9], to seamen discharged in foreign ports were sought to be enforced. The court refused the application, upon the ground, that it was a recent municipal regulation not incorporated into the contract. But the court then declared and again recognised the principle, that if the claim had not grown out of a recent legislative act, but was due by the universal usage and custom of the country, or if the regulation had been embodied in the contract, so as to compose a part of it, it would have entertained the suit. In either case we see, that it must have been a claim ultra the ordinary earned wages, founded on a special agreement, or a general usage incorporating itself into the contract. And this in a case, where the court is most reluctant to entertain jurisdiction, I mean, in controversies respecting foreign seamen on voyages in foreign ships. Under a like regulation in a British statute, the court would not have felt any doubt. Indeed in all cases, where wages are decreed by way of compensation, although not earned, as in cases of an illegal discharge, of capture and recapture, of collusive impressment, &c. the court abandons the strict notions of the common law, and deals in all the equities, which by usage or princi-

ple belong to the contract, as a maritime contract. See The Beaver, 3 C. Rob. Adm. 92; The Jack Park, 4 C. Rob. Adm. 308; The Exeter, 2 C. Rob. Adm. 261. The acknowledged jurisdiction exercised by the admiralty in cases, where wages are paid by the run, might be disputed upon the narrow rule of the common law; for it supercedes the general marine regulations, and is a special contract, different in obligations and rights, from those which belong to the common contract. See Cutter v. Powell, 6 Term R. 320; The Pearl, 5 C. Rob. Adm. 224. But I do not mean to dwell further on this point. My opinion is that if the plaintiff is entitled to be cured at the expense of the ship, it is a claim in the nature of additional wages during the period of sickness; and is just as proper for a suit of this sort, as a claim for additional pay, while in port, or for subsistence in port, where that has been unjustly withheld. It stands upon the same analogy, as the compensation allowed by our laws in cases of short allowance of provisions and water, where it is expressly provided, that the amount shall be recoverable in the same manner as wages. Act July 20, 1790, c. 29, § 9 [1 Stat. 135]. It is a part of the maritime hire and reward, constituting an essential term in the contract, and no more objectionable in point of jurisdiction than a claim for any other allowance in the ordinary course of trade, or any specific stipulation for an increase of compensation in extraordinary exigencies. The question of jurisdiction may then be dismissed.

The next inquiry is, whether the maritime law does provide, that the expenses of sick seamen shall be borne by the ship. In the elaborate argument at the bar a great variety of authorities drawn from foreign writers and foreign ordinances has been adduced in support of the affirmative. I have examined them at large, and they fully sustain the positions, for which they were cited. In the adminicular researches, (not inconsiderable) to which my duty has led me, I have not been able to detect a single instance, in which the maritime laws of any foreign country throw upon seamen disabled or taken sick in the service of the ship, without their own fault, the expenses of their cure.[2] On the contrary, the positive ordinances of the principal maritime nations expressly make these expenses a charge upon the ship. This is certainly the law of France, Denmark, Sweden, the Hanse Towns, Prussia, Holland and probably of the Italian states. Code de Commerce, b. 2, tit. 5, arts. 262, 263; Ord. de la Marine, lib. 3, tit. 4, art. 11; 1 Valin, 721; 1 Emer. c. 12, § 41, art. 15, p. 633; Cleirac, Judgmens d'Ol-

---

[2] I am not satisfied, that Spain forms an exception. Her marine ordinances have not been within my reach. And the language cited by Cleirac from the Laberinto del Commercio, contains a denial only of wages during sickness. Cleirac Us et Cout.; Commentaire sur Hanseat. Ord. art. 45, p. 104.

eron, arts. 6, 7, p. 16; Old Hanseat. Ord. arts. 39, 45; New Hanseat. Ord. tit. 14, art 2, and Kuricke Jus Marit. Hanseat. pp. 678, 821; Targa. Pond. c. 17, § 16; Id. c. 85, § 7; Jac. Sea Laws, bk. 3, c. 2, p. 144 (Frick's Translation); Pothier, Louage de Matelots, n. 189, (Cushing's Translation, p. 114); Ord. Rotterdam, 1721, arts. 224, 246; 2 Magens, 115, 118. The same principle is recognised in the ancient laws of Wisbuy (Laws of Wisbuy, art. 19), and in those of Oleron, which have been held in peculiar respect by England, and have been in some measure incorporated into her maritime jurisprudence.[3] The Consolato del Mare does not speak particularly on this point; but from the provisions of this venerable collection of maritime usages in cases nearly allied, there is every reason to infer, that a similar rule then prevailed in the Mediterranean. Consolato del Mare, cc. 124, 125; Boucher, Consulat de la Mer, cc. 127, 128. Molloy evidently adopts it as a general doctrine of maritime law (Molloy, b. 2, c. 3, § 5, p. 243); and two elementary writers of most distinguished reputation have quoted it from the old ordinances without the slightest intimation, that it was not perfectly consonant with the received law and usage of England. Abb. Shipp. p. 2, c. 4, § 14; 2 Brown, Adm. 182–184. There is perhaps upon this subject a greater extent and uniformity of maritime authority, than can probably be found in support of most of those principles of commercial law, which have been so successfully engrafted into our jurisprudence within the last century. Against such an accumulation of evidence of the sense of the commercial world I profess myself wholly unable to devise a satisfactory answer, even if I felt any secret doubts as to the propriety of entertaining the doctrine. But it appears to me so consonant with humanity, with sound policy, and with national interests, that it commends itself to my mind quite as much by its intrinsic equity, as by the sanction of its general authority. Seamen are by the peculiarity of their lives liable to sudden sickness from change of climate, exposure to perils, and exhausting labour. They are generally poor and friendless, and acquire habits of gross indulgence, carelessness, and improvidence. If some provision be not made for them in sickness at the expense of the ship, they must often in foreign ports suffer the accumulated evils of disease, and poverty, and sometimes perish from the want of suitable nourishment. Their common earnings in many instances are wholly inadequate to provide for the expenses of sickness; and if liable to be so applied, the great motives for good behaviour might be ordinarily taken away by pledging their future as well as past wages for the redemption of the debt. In many voyages, particularly those to the West Indies, the whole wages are often insufficient to meet the expenses occasioned by the perilous diseases of those insalubrious climates. On the other hand, if these expenses are a charge upon the ship, the interest of the owner will be immediately connected with that of the seamen. The master will watch over their health with vigilance and fidelity. He will take the best methods, as well to prevent diseases, as to ensure a speedy recovery from them. He will never be tempted to abandon the sick to their forlorn fate; but his duty, combining with the interest of his owner, will lead him to succor their distress, and shed a cheering kindness over the anxious hours of suffering and despondency. Beyond this, is the great public policy of preserving this important class of citizens for the commercial service and maritime defence of the nation. Every act of legislation which secures their healths, increases their comforts, and administers to their infirmities, binds them more strongly to their country; and the parental law, which relieves them in sickness by fastening their interests to the ship, is as wise in policy, as it is just in obligation. Even the merchant himself derives an ultimate benefit from what may seem at first an onerous charge. It encourages seamen to engage in perilous voyages with more promptitude, and at lower wages. It diminishes the temptation to plunderage upon the approach of sickness; and urges the seamen to encounter hazards in the ship's service, from which they might otherwise be disposed to withdraw. It would therefore be matter of regret to find incorporated into the common law a doctrine at variance with that, which seems so generally to have received the approbation of continental Europe. No evidence of such a variance is produced; and I am not bold enough to desert the steady light of maritime jurisprudence for the more doubtful guide of general reasoning.

We are next led to the consideration of the question, whether this charge created by the maritime law has been repealed by our navigation acts. This is a point of no little embarrassment and difficulty, and has perplexed the minds of some of our most intelligent admiralty judges. The act of congress for the government and regulation of seamen in the merchants' service provides, that American vessels of a certain burthen and crew, bound on foreign voyages, "shall be provided with a chest of medicines, put up by some apothecary of known reputation, and accompanied by directions for administering the same; and the said medicines shall be examined by the same or some other apothecary once at least in every year, and supplied with fresh medicine in the place of such as shall have been used or spoiled; and in default of having such medicine chest so provided and kept fit for use, the master or com-

---

[3] Laws of Oleron, arts. 6, 7; 1 Bl. Comm. 419; 4 Bl. Comm. 423; Walton v. The Neptune [Case No. 17,135]. Judge Peters has very correctly expounded the meaning of the words, "deducting charges," &c. in the 7th of the Laws of Oleron, in this case. They mean extra charges, for more delicate diet than usual.

mander of such ship or vessel shall provide for and pay for all such advice, medicine, or attendance of physicians, as any of the crew shall stand in need of, in case of sickness, at every port or place, where the ship or vessel may touch or trade at during the voyage, without any deduction from the wages of such sick seaman or mariner." Act July 20, 1790, c. 29, § 8 [supra]. By a subsequent act this provision is extended to vessels of a smaller burthen and crew engaged in the West India trade. Act March 2, 1805, c. 88 [2 Story's Laws, 971; 2 Stat. 330, c. 28]. The argument of the counsel of the respondent is, that these acts create a virtual repeal of the general charge in all cases, in which the medicine chest is duly furnished.

It is observable, in the first place, that the clause is merely in the affirmative, and contains no words abolishing the charge generally, or repealing it in the special cases within the purview of the acts. The most, that can be urged, is, that it carries a strong implication against the allowance of the charge, when the medicine chest is properly supplied. In the construction of statutes it is a general rule, that merely affirmative words do not vary the antecedent laws or rights of parties. There must be something inconsistent with or repugnant to them, to draw after a statute an implied repeal, either in whole or pro tanto of former laws; otherwise the statute is supposed to be merely declarative or cumulative. The acts under consideration do indeed make a new provision; for independently of them, there does not seem to exist any obligation on the part of the owner to provide a medicine chest for the use of the ship during the voyage; and it is obvious, that unless medicines are so provided, seamen taken sick at sea will be without any means of obtaining suitable remedies. In this view the provision is auxiliary to that of the maritime law; and is a substantial benefit to seamen by enlarging the means of recovery. In any other view it is a serious diminution of their antecedent rights, giving them medicine, but charging them medical advice, and thus abridging their most important permanent interests. It cannot readily be believed, that congress, which has on so many occasions manifested a solicitude to guard the interests and secure the safety of this invaluable, though improvident, class of men, can have intended to increase their burthens, narrow their privileges, or expose them to the danger of still harder sufferings. If indeed, to avoid such a conclusion, one were driven to the indulgence of conjecture, it might not be too rash to suppose, that the legislature was doubtful, or not aware of the doctrine of the maritime law; and had provided, however inadequately, for the relief of seamen by a measure of precaution, which might mitigate the evils of sudden calamity. There is also some peculiarity in the penning of the clause, which deserves notice. In default of the med-

icine chest the master is to provide and pay for all advice, medicine and attendance of physicians; and it is not said, that the charge shall be ultimately borne by the owners; nor is there any intimation, that the master is in any way to be reimbursed. For aught, that the statute has declared, the charge is to be personally borne by the master, in the nature of a penalty for an omission of his duty; and if the owner is to be reached, it is, because the statute obligation is to be construed equitably beyond the parties, whom it designates. And if it is to receive an equitable construction for the relief of the master, there is no reason, why it should receive a construction broader than its terms to the injury of the seamen. Assuming then, that medicines and medical advice are not a charge on the ship, where a proper medicine chest is on board, it does not follow, that other charges of sickness are entitled to the same exemption. That would be carrying the doctrine of constructive repeals far beyond what courts of justice have hitherto thought it reasonable to assert.

In the next place, the clause itself applies in terms only to the expenses of advice, medicine, and attendance of physicians. It considers the medicine chest and medical directions, (very erroneously, as experience has shewn,) to be equivalent to the regular administration of medical advice. They may be, as has been already hinted, of great utility at sea; but when the aid of a physician, as well as medicines suited to the particular case, may be obtained in port, it is almost trifling with life to entrust the management of diseases to the unskilfulness or rashness of a ship's crew. Such however as the provision is, it manifestly contemplates, that the sick seaman is on board, or in a situation to command the use of the medicine chest and directions. It cannot therefore be intended to apply to cases, where the seaman is removed on shore, and is deprived of these benefits. To him the nonexistence of the medicine chest, and the incapacity to obtain the use of it, are precisely equivalent. Whenever, therefore, the sick seaman is removed ashore for the convenience of the ship, whether with his own consent or without it, if he does not draw his medicines from the chest, he is entitled to an allowance equal to his expenditure for medicines. There is, however, another more important point of view, in which the clause deserves consideration. A sick seaman, while on board, is entitled to receive suitable sustenance and attendance from the ship and crew during his illness. And the marine ordinances already referred to, which are evidence of the general maritime law, authorise a similar allowance, when he is put ashore. The seventh article of the laws of Oleron is express on this point. It declares, "if it happens, that sickness seizes on any one of the mariners, while in the service of the ship, the master ought to set him ashore." This was a very humane provision, and easy

in practice, in the short coasting voyages of small vessels, which hugged the shores at the period, when these laws were promulgated; but not always convenient or necessary in our longer voyages with our spacious ships. It adds, "and also to spare him one of the ship's boys, or hire a woman to attend him, and likewise to afford him such diet, as is usual in the ship." The 19th article of the laws of Wisbuy directs in like manner, "that if a seaman falls ill of any disease, and it is convenient to put him ashore, he shall be fed, as he was aboard, and have somebody to look after him there."[4] The 45th article of the Hanseatic ordinance is to the same effect. "If any mariner falls sick of any disease, he shall be put ashore and maintained in like manner, as if he was on shipboard, and be attended by another mariner."[5] The French ordinance in its summary way only declares, that the seaman shall be cured at the expense of the ship, (panse au depens du navire,) which of course includes every sort of expenditure. Admitting therefore, that the acts of congress exempt the ship from the charge for medicine and medical advice and attendance, there is nothing, that in the remotest degree affects the charge for board, lodging, and nursing, while the sick seaman is on shore. This accordingly remains a charge upon the ship, and is to be borne by the owner, upon the principles of maritime law. This is not a novel construction of the acts, for the first time promulgated; although that would not form any solid objection to it, if it stood commended by just rules of interpretation. The doctrine has been asserted for a long time by some of those tribunals in our country, whose familiarity with proceedings of this nature entitle them to very great respect. See Walton v. The Neptune [Case No. 17,135]; Swift v. The Happy Return [Id. 13,697]. I am not aware, that it has been judicially doubted. My own judgment follows it with an unhesitating assent.

The remaining question is, whether the particular circumstances of the case before the court furnish an exception to the application of the general doctrine. It is said, that the shipping articles contain an express stipulation on this subject. The clause alluded to appears from the record before the court to be an addition inserted in writing, at the very close of the printed instrument, after the usual in testimonium clause. It is in these words: "We further agree and bind ourselves to pay for all medicines and medical aid, further than the medicine chest affords." Now, there is not the slightest evi-

[4] "Gardè et servi par un valet," is the expression in Cleirac, page 84.

[5] The common English translation of these ordinances is quoted, not for its exactness, but because it sufficiently conveys the sense. The ordinances are to be found in English, in Peters' Admiralty Reports, and in French in Cleirac. Us et Coutumes de la Mer.

dence of the time, manner or circumstances, under which this clause was inserted. It is a stipulation ultra the common shipping paper, and from the place, which it occupies in a printed instrument, and the importance of its contents, there is some reason to call for an explanation of it. It is well known, that the shipping paper is always in the possession of the master or owner; and considering the class of persons, whom it respects, and whose rights it controls, it is not too much to expect, that a very material variance from the common articles should be proved by the most satisfactory evidence to have been fully explained to the seamen before it should bind them. Every court should watch with jealousy an encroachment upon the rights of seamen, because they are unprotected and need counsel; because they are thoughtless and require indulgence; because they are credulous and complying; and are easily overreached. But courts of maritime law have been in the constant habit of extending towards them a peculiar, protecting favor and guardianship. They are emphatically the wards of the admiralty; and though not technically incapable of entering into a valid contract, they are treated in the same manner, as courts of equity are accustomed to treat young heirs, dealing with their expectancies, wards with their guardians, and cestuis que trust with their trustees. They are considered as placed under the dominion and influence of men, who have naturally acquired a mastery over them; and as they have little of the foresight and caution belonging to persons trained in other pursuits of life, the most rigid scrutiny is instituted into the terms of every contract, in which they engage. If there is any undue inequality in the terms, any disproportion in the bargain, any sacrifice of rights on one side which are not compensated by extraordinary benefits on the other, the judicial interpretation of the transaction, is that the bargain is unjust and unreasonable, that advantage has been taken of the situation of the weaker party, and that pro tanto the bargain ought to be set aside as inequitable. Hence every deviation from the terms of the common shipping paper, (which stands upon the general doctrines of maritime law,) is rigidly inspected; and if additional burthens or sacrifices are imposed upon the seamen without adequate remuneration, the court feels itself authorised to interfere and moderate or, annul the stipulation. And on every occasion the court expects to be satisfied, that the compensation for every material alteration is entirely adequate to the diminution of right or privilege on the part of the seamen. Such, as I understand it, is the general doctrine of admiralty jurisprudence on this subject; and I am very slow to doubt either the wisdom or policy, which has breathed so humane a principle into the system.

In the case of The Juliana, recently de-

cided in the high court of admiralty,[6] Lord Stowell, with his accustomed ability went into a large discussion of this subject; and he set aside an express stipulation, by which the wages of the seamen, earned in the intermediate periods, were made to depend upon the ultimate successful termination of a long and divided voyage. To the praise so justly pronounced at the bar upon this admired and eloquent judgment, I take leave to add my cordial assent. It is uttered in such a liberal spirit, in such a tone of graceful moderation, and in such a philosophical and rational equity, that it can scarcely fail of universal approbation. The question was not however, as the learned judge supposed, "untouched by any court." A like judgment had been pronounced in America many years ago; and it fell to my lot in my early professional life to have taken a report of a case (which has since found its way into print) in which this doctrine was fully discussed and recognised in a court of common law. In our admiralty courts it received an explicit support at a very early period. See Abbott, Shipp. (Story's Ed. 1810) p. 487, note. There is no pretence, that any extraordinary compensation has been allowed in the present case. The wages are at the ordinary rate, and all the ordinary risks of loss, fastened upon the seamen during the voyage by the maritime law, attach to their earnings here. The duty of the court, under such circumstances is plain; it is to set aside the stipulation as grossly inequitable. But it is said, that this is the case of a mate, which is distinguishable from that of a common mariner, because his rank, character, and intelligence, place him above the pupilage, which the law chooses to impute to the ordinary laborers of the sea. There is certainly a plausible ground for a distinction between the higher officers of the ship and the common mariners in many voyages, and it deserves grave consideration; but whether it would be safe to apply it to all short voyages in small vessels, or even to West India voyages in general, is more than I am prepared to answer. There are cases, in which the officer is so low in rank, or from the nature of the voyage so slightly in advance of the common seamen, that the distinction would perhaps partake more of refinement than justice. It would take from the rule a saving grace in cases, which might call most loudly for its enforcement. But it is unnecessary nicely to scan this proposition, because here the mate, in answer to the allegation of the owner, denies on oath any knowledge of the existence of such a clause in the shipping paper. It has been said, that a clause of similar import was some years ago introduced into the articles, and is now in common use in the port of Portland;

[6] Decided March 19, 1822, and reported in the London New Times, March 20, 1822, and New-York Evening Post, May 13, 1822.

and from that circumstance the court ought to presume a knowledge on the part of the mate of this stipulation. Now, it might be a sufficient answer, that in this case there is no evidence of the former habits and voyages of the mate. For aught, that appears, this may have been his first and only voyage from Portland. The presumption could only arise, when the habit of constant employment in the port under similar articles must be supposed to force knowledge home to the most inattentive officer. But in point of fact, the printed stipulation in the ship's articles at Portland is not exactly similar to that, now under consideration. In the printed form handed to the court, the clause stands thus, "Deducting therefrom all such expenditures as the masters or owners of said vessel, cargo or freight shall have incurred in any port, for medicine, surgical and medical aid, nursing, and all and every expenditure whatever, by reason of sickness, wounds, or other disease, for or on account of such seaman or mariner, beyond what may be furnished from the medicine chest, on board of said vessel, the same chest being provided according to law." In some respects this clause is more extensive than that before the court, for it includes nursing and all other expenditures; in other respects it is more limited, for it annexes a condition, that the medicine chest is duly provided, whereas the other clause is absolute in its terms, and independent on any such contingency. So that there is no pretence to infer a knowledge of the one clause from that of the other. Looking then to the other circumstances of the case, the peculiar structure of the clause, its position in the instrument, and the absolute denial on oath by the libellant, it does not seem too much to hold, that it was never in his contemplation a part of the shipping articles. He was ignorant of its existence, and never assented to its obligatory force.

But there remains an insurmountable objection to the clause in the articles before the court, that has not yet been alluded to. I mean its utter hostility to the act of congress. It is an attempt to procure through the medium of contract a dispensation from obedience to the express command of the legislature. In the eye of this clause, it is wholly immaterial, whether the medicine chest be properly furnished or not, or indeed whether there be any on board. It annexes no condition, and assumes no responsibility on this head. And if by a stipulation of this sort the legislative policy can be evaded, it is easy to foresee that the scheme will soon become universal in its adoption and complete in its operation. A public grievance so mischievous cannot for a moment be permitted. The law will work its way through every contrivance of this nature. And I have no hesitation in pronouncing, that the clause is illegal from its direct contravention of the policy of the act of congress. Even

if this interpretation of the clause admitted of controversy, and we should incorporate into it an implied proviso, that the medicine chest should be regularly supplied, it would not aid the present case. For, upon the direct and satisfactory evidence of highly intelligent physicians, the medicine chest of the Enterprize was utterly inadequate for the voyage. In the course of the investigation of this suit, it has come to the knowledge of the court, that there is a most criminal neglect and indifference on this subject, that cannot but excite the most painful surprise and mortification. When we find, that some merchants in this neighborhood, instead of directing a medicine chest to be furnished and replenished with an adequate stock of all the necessary medicines, drive a hard bargain for a supply of the most ordinary kinds, and of those least adapted to the voyage, at a very trifling fixed price; and when even such medicines are insufficient in quantity, it cannot but create a feeling little short of indignation, that there should exist among a moral people, such an insensibility to human suffering, and such a carelessness of human life. This information, which for the first time has been brought to the notice of the court, is most unwelcome, and calls upon it, as an imperious duty, to pronounce the most pointed reprobation of the practice. If owners will persist in this practice, they shall not, so far as this court is concerned, derive any benefit from such a violation of duty. Whenever they seek to exonerate themselves from the charges of sickness imposed upon them by the maritime law, the burthen of proof of the sufficiency of the medicine chest in all respects rests upon them. And the court will require the fact to be established by the testimony of disinterested persons, and not exclusively to depend upon parties, who have trafficked for the supply at a low fixed rate, and may feel a deep interest in point of reputation and custom to gloss over the infirmities of the transaction. In this way the obvious policy of the act of congress will be enforced, and the mischiefs of a gross departure from it may be in some measure redressed.

In every view, which the court has been able to take of the point now under consideration, the respondents have failed to establish, that they were not originally liable for the charges of sickness claimed by the libellant. But it is insisted, in the last place, that the claim, whatever might have been its original validity, has been completely adjusted and settled by the parties. And a receipt, given by the libellant, is relied upon as satisfactory proof of the fact. In respect to instruments of this nature, however general and comprehensive their terms may be, there is no pretence to say, that they have a binding and conclusive effect. The most, that can be attributed to them, is, that they afford prima facie evidence of all, that they purport to declare, and that they are to stand, until overthrown by counter proof from the other party. They do not arrogate the high prerogatives, which the common law has attributed to releases under seal; and even these may be set aside in equity, when surprise, fraud, mistake, or undue influence have intervened to the material injury of the party. It need hardly be said, that courts of admiralty in the administration of their duties, seek to follow the general principles of justice, rather than technical rules, and consequently avail themselves more of doctrines founded in general equity, than in the inflexible strictness of the common law. They have not the rashness to impute blame to the latter, for they are not insensible of its excellence. But they understand, that the common law does not affect to apply remedies to all cases of injustice; and leaves to other courts the full right to pursue a more enlarged equity, whenever their constitution enables them to favour and support it. When a receipt is given in full of all demands, it is not to be taken in the admiralty as conclusive. It is open to explanation, and upon satisfactory evidence may be restrained in its operation. But the natural presumption is in its favour, and that presumption will prevail, until it is displaced by direct proof or strong circumstances. Indeed in cases of doubtful or conflicting claims, where a compromise takes place, and receipts are given, as final discharges between the parties, upon deliberate consideration and in good faith, there is the greatest reason to uphold these instruments, for they tend to general repose and security. But when there has been no such compromise; when there has been an entire mistake of right, or an unobserved comprehensiveness in the language, reaching beyond the matters under settlement, there would be gross injustice in refusing the injured party an equitable relief. These observations apply to general receipts. But when, as in the present case, the receipt is merely annexed to the foot of an account, and admits the payment of the balance only, it is to be viewed merely as a stated account, and confined in its operation to the items, which are specified. It cannot by any ingenuity be made to reach other claims, which it neither recognises nor repudiates. Now a stated account is liable to be impeached; and in a fit case the party is admitted to surcharge and falsify it. If errors and mistakes are apparent on the face of it, or the party comes with a strong case, recenti facto, courts dealing in equities are in the constant habit of affording relief. And, what presses with more force on the present occasion, there are situations of peculiar influence and confidence between the parties, in which the opening of settled accounts is very reluctantly refused, and very easily permitted. But it is not necessary to examine this matter very minutely, because, in the case before the court, there is no settlement of any claim, except that of

wages and an inconsiderable item for medicines. The other items are not even mentioned in the account; and it is signed with an express exception of errors. It therefore concludes nothing, and is now open to correction as to the item of medicines, for which, upon the principles already stated, the libellant is not liable. As a receipt, or as a stated account, it presents no bar whatsoever to the controverted claims; and if a final settlement of these claims is to be established upon evidence aliunde, that evidence has not as yet been produced. On the other hand, such a settlement is utterly denied by the oath of the libellant, and that oath is supported by the exception of errors on the settled account. This point of defence may then be dismissed without farther comment, as sustained neither de facto, nor de jure.

The material points presented at the bar having been considered, the remaining duty of the court is to pronounce its own judgment; and it is, that the decree of the district court be reversed, and that the sum of fifty-two dollars and sixty-two cents, together with the costs of suit be awarded to the libellant. In justice to the district judge it is proper to remark, that the case stands before this court very differently in point of evidence from that, which was presented to him. Decree accordingly.