# SUPREME COURT—IN ADMIRALTY.

### N. C. BROOKS *vs.* G. C. ENBERG, MASTER OF THE BARK "GRE-FERBERG."

THE voyage being described in the Shipping Articles as a *whaling voyage*, if, by the act of the master, it was changed to a trading or freighting voyage, and the original purpose was neglected to accomplish other objects, it is a violation of the contract, for which damages in the shape of wages may be awarded, according to the circumstances of the case, to the persons employed under the contract of shipping.

An exchange of articles for provisions for the ship, or trading which does not interfere with the original objects of the voyage, held not to be a deviation, etc.

Parol evidence cannot be admitted to vary the contract of wages in the Shipping Articles.

ALLEN, C. J.

This is a libel for the share of the libellant, as first whaling officer on a whaling voyage to the Northern Seas and back to Honolulu, and also for damages for a deviation of the voyage from its legitimate purpose of whaling to trading and visiting, etc.

The answer admitted the service and share of the libellant, but denied any deviation from the legitimate purpose of the voyage, of trading and visiting as alleged. The counsel for the libellant filed the following demurrer :

" The respondent moves the Court to dismiss the libel in this cause, with costs to the respondent, on the ground that the allegations in the libel do not set forth a cause of action cognizable in a Court of Admiralty. That it was a special action on the case for the nonfulfillment of a contract. That this Court, as a Court of Admiralty, had not the power to try the question of damages in a special action on the case. That the libellant did not allege that he had performed the work, but claimed damages for being prevented from performing his services," which was overruled. It is a general principle of law that contracts for marine service come within the admiralty jurisdiction. The libellant made a contract to serve on board

the bark "Greferberg," as whaling officer on a cruise to the Northern Seas at a stipulated price as set forth in the libel, and he alleges that he faithfully performed the terms and conditions of the contract on his part.   He further alleges that there was taken by the ship 275 barrels of oil, that the master violated the shipping contract by diverting the voyage from its legitimate purpose of whaling to that of trading, as well as many other of its stipulations, which it is not necessary for me here to recapitulate.   The Court regards the cause as set forth in the libel as clear and explicit.   It is true that the libel claims for a violation of the contract in not whaling, as well as for payment of the sum stipulated in the contract for the number of barrels of oil taken.

Courts of Admiralty do not require all the technical precision and accuracy in pleading, which is demanded in Courts of common law.   It is only requisite that the cause of action should be plainly and explicitly set forth, not in any particular formula, but in clear and intelligible language, so that the adverse party may understand what he is required to answer, and make an issue on the charge.   (Jenks & Lewis, Wace's Rep., 52.)

The admiralty has jurisdiction over all maritime contracts, wherever the same may be made or executed, or whatever may be the form of the stipulations.   (De Louie *vs.* Bait e' als., 2 Gall., 397.)

There has been a great deal of legal discussion by the ablest jurists in relation to the jurisdiction of the admiralty and common law Courts ; and at one time it was held that the admiralty had no jurisdiction over mariner's wages because the contract was made on land.   But at this day the right of the admiralty to entertain suits for mariner's wages is fully acknowledged. So if after the hiring of seamen, the owners of the ship abandon the intended voyage, or if it be broken up from any cause not arising from the fault or misconduct of the crew, they are entitled to receive wages in the nature of damages, the amount being discretionary and controlled by circumstances of the particular cases.   (Hivelas on Maritime Laws ; Abbot on Shipping, 749 ; 2 Peters' Adm. Reports, 261 ; 2 Brown's Adm. App., 533 ; Bee's Rep., 48, ib. 134.)

The Maritime Codes of foreign nations have adopted the rule

of the civil law, which gives to the seaman full compensation for the whole period which he has contracted, if he is discharged without his default. In addition to this the Hanseatic and French ordinances allow him the expenses of returning to the country of his departure. The Courts of Admiralty of the United States give the party compensation for the injury he has sustained according to the circumstances of each particular case. Chief Justice Story says "that the Admiralty which in this respect is sometimes followed by the Courts of common law, does not hesitate to pronounce for compensation in a simple suit for wages. It is not that the Admiralty cannot sustain a suit for damages, but it deems it proper to award damages in the shape of wages." He says that, in all cases, a compensation is intended to be allowed which shall be a complete indemnity for the illegal discharge, and this is ordinarily measured by the loss of time, and the expenses incurred by the party. The same principle is sustained in the case of Sprague *vs.* Shaw, (9 John. Rep., 139,) where the Court says, "that it is an acknowledged principle of the marine law that if the master unjustly dismiss a seaman during a voyage, he is entitled to his full wages for the voyage." (Laws of the Hanse Towns, Act 42 ; 2 Peter's Adm'y Rep., 420 ; 2 Sumner, Reed *vs.* Canfield, 195 ; 3 Kent, 239 ; 2 Mason, 541.)

It appears that there were shipped at this port in addition to the full complement of officers belonging to the ship, five additional officers, or mates, of whom the libellant was the first whaling officer. In the written contract and shipping articles, the rights and duties of these whaling officers is not set forth, as contradistinguished from the officers already belonging to the ship. It appears in evidence that they were to act and did act as boat-headers—and the officers proper, as boatsteerers. It is alleged in the libel that he was to have the management and control of the whaling. This is not the construction which I give to the contract. The master of the ship was invested with the powers and subject to the responsibilities of his command, and I do not see that he has delegated any of this authority by engaging additional officers to his ship, whose only duty was whaling. They were employed to execute his lawful orders. Any other construction would make a separate command on

board, which is altogether incompatible with the terms of the shipping articles.

The voyage was for whaling, and it is alleged by the libellant that it was diverted from the purpose to trading, and thereby caused great damage to him, for which he should be remunerated.

This is denied by the libellee. This is the principal issue between the parties.

It is the custom and usage of whaleships to take on board some articles of trade, which are found convenient and profitable to exchange for supplies for the ship. This is commendable in owners and masters, for it is very desirable for these persons at sea, to have as often as may be, fresh provisions and vegetables. It is a protection to health, and ought to be encouraged. In this, Capt. Enberg conducted with a proper regard for the comfort and health of his men, and deserves credit for it.

As a navigator, in fine, as a master, in his kind and generous treatment of his men he is an honor to his profession. If he has erred, it has doubtless arisen from a want of a full appreciation of the duties and obligations of the whaling service.

The ablest and best masters of ships differ in some respects in the administration of affairs, but it cannot be denied that the internal police of this ship was creditable to the master.

It is very seriously urged here that there was a culpable negligence and omission in keeping a lookout at the mast head. The evidence is somewhat conflicting in relation to this point, but it does not appear that the first whaling officer ever urged the master to permit him and his associates to exercise unusual vigilance in this particular. Had he done this, it is not probable that the master would have interposed any objection. The only question of difficulty is that of a deviation of the voyage, and a deviation of it from its legitimate purpose of whaling. If the evidence sustains this allegation the libellant is entitled to be indemnified. He made a contract for this object, and none other ; and it is the duty of the master to pursue it honestly and perseveringly, and afford every opportunity to the men employed to exercise their skill and courage in this adventurous business. Had he then any purposes and interests

which conflicted with the general object of the voyage ?  The
evidence in this case is very voluminous, but I do not deem it
material only to advert to the portion which bears upon the
material point in controversy.  It appears that the bark " Gre-
ferberg" sailed from this port for the Ochotsk Sea on the last
day of March and arrived in that Sea near Jonas' or St. John's
Island on the first of May.  The Master of the bark having
some articles of trade on board which he wished to dispose of,
made an effort to push through the ice so that he could arrive
at the City of Ochotsk before the vessel of the Russian Ameri-
can Company.  Instead of this course to the northeast he should
have given a direction to the ship so as to have kept her in
clear water, thereby taking the chances for whales.  In this
effort to get to the City of Ochotsk, he failed on account of the
ice, and he then sailed for the Horse Shoe Bay, where trading
was carried on, but nothing incompatible with the business of
the ship.  From Horse Shoe Bay he sailed for Oudskoi, and
here he bargained for some skins, with an understanding to re-
turn for them, which he did do in the fall.  Thence to Kouran,
and between the two places spent twelve or fourteen days.  A
number of cases of prints and liquors were landed.  He was
cruising between the different ports, trading and visiting, and
whaling, till he put away for Southwest Bay in Shantar Island,
where he arrives on the 19th of July, during all this time taking
only twenty-five barrels of oil, where he continued whaling
until August 25, and took about two hundred and fifty barrels
of oil.  And here where he was reasonably successful in taking
oil, and the prospect was flattering for good success, still he
deemed it proper to leave this locality where he had had suc-
cess, to make passage to Ayan, for the object of seeing the
Governor, who was expecting soon to leave.  It is in evidence
that he landed goods at this place to a considerable amount,
which is not very definitely fixed by either party, but altogether
beyond what was required for the supplies.  From Ayan he
sailed to Oudskoi and back again, and thence to Centre Bay,
where he went for spars ; thence to Petropaulaski, where he
arrived on the 4th of November, and remained there till the
25th of November.  At the latter place he took on board some
materials of a ship belonging to the same owners.  Here some

trading was done, and the birthday of the Captain was cele-
brated. Thence he sailed for Honolulu, where he arrived on
the 26th of December.

From the evidence, which I do not deem it necessary more
fully to detail, I am satisfied that the Captain did devote his
attention to other objects than those which his contract en-
joined.

The general principles of law respecting deviations are very
clearly understood, and in most commercial countries they give
the men a legal right of discharge, and payment of wages at the
port of departure. So if the voyage be interrupted and lost by
the act of the master or owner, the seamen have a valid claim
for an adequate compensation. And when a different construc-
tion has prevailed, it has always been required that any altera-
tions of the original voyage that the owners or masters may
make, shall be accompanied with notice and compensation to
the mariner. By the Danish Code, mariners are not allowed to
leave their master on account of an enlargement of the different
destination, but are entitled to an increase of wages; substan-
tially the same principle is incorporated in the laws of Holland.
(7 English Ad. Rep., "Elize," 182; ibid "Countess of Harcourt,"
248; ibid "Minerva," 347; ibid "George Home," 370. See 243,
the "Cambridge," 7 Ad.)

Parsons, a very accomplished writer on mercantile law, says:
"An extraordinary and unnecessary protraction of the voyage
would be a deviation. But that the mere length of the voyage,
without other evidence, would not prove this." And this doc-
trine is sustained by authorities. (12 Wheaton, p. 383; 4 Esp.,
25; 2 John. Rep., 138, 143.)

In insurance cases the law is rigid in requiring the perform-
ance of the precise voyage insured, and no one can doubt that
the rule is founded on sound policy, otherwise it would subject
the insurers to hazard not contemplated by the contract.

Delay or change of course to save shipwrecked men is justi-
fied by the law, and not regarded as a deviation. A master has
no right to deviate from the accustomed route without a legal
cause, such as stress of weather, or to procure necessary repairs
or to gain convoy, or to avoid capture or detention. (3 Kent,
391.) Nor to substitute another voyage for the one agreed

upon between the owners and freighters of the ship. Every-thing beyond the voyage agreed upon, is out of the scope of his authority as master, as such he has no power to change that voyage for another. This doctrine is thus clearly laid down by Flanders on shipping, and sustained by numerous authorities.

I do not consider this decision as establishing any new prin-ciple in the maritime law, as it has been intimated by the counsel that such a decision would, but the application of prin-ciples already settled to the combination of circumstances as presented in this case, and which, so far as any cases have been reported, may be regarded as new.

The voyage described in the shipping articles was a *whaling voyage*. It was neither a trading voyage nor as a freighting voyage, and if the original purpose was neglected to accom-plish other purposes, it was a violation of the contract, and here let me say that I do not regard the exchange of articles of trade for provisions for the ship, or any additional trade which the master may make, in the regular course of the voy-age, which does not interfere with the original purpose of the voyage as a foundation for damages on the part of the persons employed.

The question arises then on the evidence in this case, whether Captain Enberg devoted more time than was necessary for the legitimate purposes of supplying his ship to other purposes which may have been interesting and valuable to himself, and in which the seamen were coparticipants. The obligations of contracts are mutual. The master by his contract for whaling promises compensation for services, according to the amount of oil taken, and hence if he lessens the opportunity for whaling, he lessens the chances for a voyage. He violates the spirit of the contract when he ceases to prosecute his voyage with vigor, and with a single purpose. Everything which conflicts with this tends to lessen the aggregate of the voyage, and of course the compensation.

From the evidence I do not perceive that the master resisted the claim for additional compensation from improper motives, but rather from a partial estimate, or appreciation of the exact rights of parties. It has been contended on the part of the master that the intention of going to Petropaulaski was

known to the seamen, and they did not express any objection. I do not regard it necessary for them to protect their legal rights, to have remonstrated with the master, although in this case it does not appear that the master made any direct communication, and all that was known about it was by general report on the ship. It is said they might have taken passage in the ship "Montezuma," bound to this port, but there is no evidence that a passage was proffered to them, and if there had been, it was not incumbent on them to leave their own ship with their interest of the voyage on board. It was clearly such a deviation as in a freighting voyage would have entitled the men to a discharge, and consequent payment of the wages and expenses to the port of their departure.

The question of damages in this cases is more difficult than in most others. It is contended, on the part of the libellant, that he should have pay for the largest catch of the season, as the opportunity, which was legally enjoined, required, by the contract of devoting the entire season to the whaling business had not been afforded him. It is true that the entire season has not been so devoted, but that a portion of the season has, and in this the ship had not very great success. From the 19th of July to the 25th of August, she was in South W. Bay, and secured about two hundred and fifty barrels in a very favorable part of the season. She took some twenty-five barrels on other grounds which, at times, had been regarded as favorable for whaling purposes, but either from the absence of whales, or the want of entire and vigorous devotion to the business, there was no success. It is not clear that the opportunities of the ship were equal to the highest success, of this the libellant was well advised. He knew the experience of the master and his officers and men in this branch of business, and that it was not so thorough as in many other ships. He could judge, too, quite well of the inefficiency of two sets of officers, who should have different powers on board ship, and in the boats in pursuit of whales, all which would not tend to promote success. I do not think that he had reason to expect the success equal to the best appointed ships. Then, is the average catch of the season a fair basis? To test the accuracy of this, it would require a very clear proof of the capacity and appointments of

the different ships, barks and brigs, as compared with the "Greferberg," and which has not been adduced, therefore I do not see that this would be an entirely satisfactory mode of fixing the right measure of damages. The better basis is the amount which the ship did take, as compared with the opportunity and advantages of whaling, which was not availed of by the Master on account of the diversion made from its legitimate purpose, which consumed some time at the different ports before adverted to, and also the deviation made to Petropaulaski, and the delay made there, which was from the 4th of November to the 26th, when by the contract the master had no right to go out of his way for freight. It consumed time which was valuable at this, the agreed port of discharge to men engaged in the whaling service, to enable them to make new engagements for the next season. This deviation alone consumed very nearly one month.

It is contended that the libellant was by parol agreement, at the time the contract was made and signed, invested with special authority over the whaling operations of the ship. It is a settled principle of law that parol evidence cannot be admitted to vary the contract of wages in the shipping articles. (Gilpin's Rep., 305), and I do not regard parol evidence as competent to impose upon the officer any greater authority, duty or obligation, than what is clearly defined in the shipping articles. Therefore all the injury alleged by a non-compliance with Mr. Brooks' orders is not a subject of a damage, proper for the Court to consider.

The libellant, by the shipping articles, is entitled to one dollar per barrel for the amount of oil taken, which was two hundred and seventy-five barrels, which amounts to $275.

In view of all the circumstances, not only of the deviation of the voyage from its legitimate purpose during the whaling season, but from the delay incident to the voyage to Petropaulaski, as well as the share he is entitled to by the articles, I hereby award and decree the sum of $600, less $200 admitted to be paid by respondent, with costs.

Decree accordingly.

C. C. Harris for libellant.

A. B. Bates and J. Montgomery for respondent.