F. Burrmeister *et als. vs.* Whaleship Speedwell.

May, 1861.

## SUPREME COURT—IN ADMIRALTY.

)

Frederick Burrmeister *et als. vs.* Whaleship "Speedwell" and her Oil.—C. A. Williams & Co., Claimants.

In cases of shipwreck, seamen are entitled to recover their wages out of the proceeds of the wreck saved by them.

Where it is proved to the Court that the only security for the seamen is their lien on the property within our jurisdiction, the voyage being broken up and abandoned, the Court dispensed with a fulfillment of the conditions of their contract of shipment, as to the mode and time of payment, and decreed them a compensation equivalent.

Seamen are bound to exert themselves to the utmost to save the vessel and cargo from peril, and as a general principle are not entitled to any consideration for such service, beyond the means furnished by the property saved for the payment of their wages.

F. Burrmeister *et als. vs.* Whaleship Speedwell.

As recognized in the case of the ship "Natchez," decided by this Court, (Hawaiian Rep., Vol. 2, p. 34,) before the seaman can be entitled to any extra remuneration for services, in saving the vessel and property, his relation to the vessel must be dissolved, and the obligations of his contract cease to be binding, as by an abandonment of the voyage, etc.

Courts of Admiralty will re-examine, if necessary, settlements made with seamen, and decree equitable compensation for services rendered, notwithstanding a receipt in full may have passed from the seaman.

ALLEN, C. J.

This is a libel *in rem* against the whaleship "Speedwell," of Fairhaven, and a certain amount of oil, being a portion of her catchings, by Richard Cumings and others, seamen attached to said vessel, to receive compensation for their shares, or lays, in said oil, and for services rendered to said vessel and oil. The material facts in the case, as they appeared by the pleadings and proofs, will be stated in the opinion of the Court.

It appears that a portion of the libellants shipped on board the "Speedwell" at New Bedford, and others at this port, and at Fayal, but all were shipped for the voyage. The ship had been in the whaling service three seasons, as the testimony is, and therefore I infer she sailed from the home port in the fall of 1857. It appears further, that the master has sent to the owners from this port, in the years 1858, 1859 and 1860, oil and bone, the catchings of those years, except the oil taken in 1861. It appears further that she sailed from this port last fall to the Coast of California, and was whaling for a while in Scammon's Lagoon, where she caught some 280 barrels of oil, and while in said Lagoon she was stranded, and after exertions to recover her from her perilous situation, without success, the master put the vessel with the oil and other property on board at auction, and a sale was effected for the sum of $8,800. She met with the accident on the first day of February, and these libellants continued their exertions in aid of the master until the sale, which was on the fifth day of the month. She struck about three-fourths of a mile from the shore, and as the wreck progressed she was moved nearer, so that most of the labor was performed within a cable's length of the shore. In performing this labor there was no danger, as there was no surf, and there was usually fine weather. There were several masters of ships

with their officers and crews who rendered aid to the "Speedwell, namely: those of the ships "Nile," "Martha," "Cynthia," and "Charles W. Morgan," but without success in restoring her. The purchase of the vessel and property belonging to her was made by Capt. Fish, of the ship "Nile," with whom Capt. Cornell, of the ship "Martha," subsequently united. They repaired the ship and brought her to this port, where she now is, in possession of C. A. Williams & Co., to whom they sold her. They also took into their possession the oil, which amounted to 1,216 barrels.

The counsel for the libellants contend, as the voyage is abandoned, it is incumbent on the master to pay the libellants their lays or shares in all the oil and bone taken during the voyage, and that they have a lien on the ship and oil to secure that payment. None of the papers of the ship were produced in Court, but it was admitted that they shipped under the provisions of the articles used at New Bedford. By them the seaman engages to perform the whaling voyage specified, and he shall be entitled to the payment of his share of the net proceeds as soon after the return of the vessel to her home port as the oil and other products of the adventure can be sold, and the voyage made up. Under this stipulation the seaman can not claim his share to be measured off and delivered to him, even at home, after the voyage is complete. By the terms of the agreement, and by the maritime law, their interest is in the proceeds realized from the sale of the articles obtained, but the counsel contend that as the voyage is broken up by the wreck of the vessel, the contract has terminated, and they should be protected in their lien, where they can find the property. There is force in this position as a general principle of maritime law. But is it a case which comes within the equitable powers of the Court, to dispense with a fulfillment of the conditions of the contract, so far as the mode and time of payment is concerned? When a mariner ships as, in this case, he usually has an advance, and receives during the voyage certain advances for clothes, liberty money, etc., etc. This account is secured by a lien on the oil, and deducted from his share of the net proceeds of the voyage. It appears in this case that all the oil, except what was taken the last year, with all the bone,

F. Burrmeister *et als. vs.* Whaleship Speedwell.

has been sent home, and doubtless has been sold, and awaits the termination of the voyage for settlement of the claims upon that fund. So far as the case is presented, the Court has not the means to make an adjudication in the matter. We do not know the amount of net proceeds of the oil and bone sent home, nor the indebtedness of the seamen. There are cases also when seamen are entitled to an additional amount to pay the expenses of their return home. It must be admitted that the master could not come to a settlement here, for the agreement is to pay what the products of the voyage will bring at home, which imposes upon the owner the cost of freight, and therefore it must decline in this class of cases to interfere in the settlement, unless it is proved to the Court that the only security for the seaman is his lien on the property within our jurisdiction. It is a principle of maritime law that this lien attaches to the ship and freight and proceeds, into whatever hands they may come, and takes priority of all other claims. (Brown *vs.* Lull, 2 Sumner, 443.) A sale by order of Court, under the law of foreign attachment, will not avoid this lien, but admiralty will still enforce it. It is true that he has no legal ownership in the oil, yet it is the source of the fund from which he is to be paid, and he has a lien upon it until sold by the owners, pursuant to the contract. Any other mode of sale cannot defeat his lien. Is it the duty of the master to settle with the crew, if he can make out their accounts, rather than leave them destitute in a foreign country, or compel them to resort to the Courts to enforce their lien on the property saved, and which, as in this instance, he has sold? He is fully authorized to do so on the principle that he is authorized to pay the wages of a merchant seaman, who is discharged abroad, either voluntarily or by necessity, having freight money in his hands.

It is contended that it will be the same as a total loss to the seamen to compel them to go to New Bedford to settle their voyage. This is not usually necessary, but if it was, it is in accordance with a well understood contract. A shipwreck works inconvenience and loss to all connected with a ship. The mariner understands this hazard as well as the owner, and each must take the consequences of it. Are the seamen who shipped at this port last fall in any different situation. Judge Bett says,

in the case of Reed *vs.* Hussey, 1 Blatchford and Howland's Reports, 538, "that the Court may undoubtedly, in the exercise of its equitable powers, dispense with a literal fulfillment of the conditions of this description of engagements, and may regard acts which are substituted by agreement, express or implied between the parties, or which are compelled by the exigencies of the voyage to be equivalent to an exact compliance with the articles." (The "Minerva," 1 Hagg., 347; the "George Home," Id., 376 ; Harder *vs.* Gordon, 2 Mason, 541.)

Has then such an exigency of the voyage arisen to justify a settlement? No product of their voyage has been sent home, and no indebtedness exists there. I am fully satisfied that the amount advanced is correctly stated. I think that justice requires that the settlement should be made here. The voyage is broken up, abandoned, and there is an end of the contract. In cases of shipwreck, seamen are entitled to recover their wages out of the proceeds of the wreck saved by them. This principle of law applies in this case, and gives rights in the proceeds of the wreck when sold ; if postponed, or the property sold would pass into other hands, loss of the wages would be probable. The master and owner cannot perform their contract. This is rendered impossible by a major force. This consideration has great force in all cases where seamen have lays or wages due, but especially in this case, as the contract was made here, and the oil taken is here. In this case the amount due is of trifling consequence. Still, whatever it may be, it should be paid, or an aliquot portion of the oil given, after retaining sufficient to pay the advances. It will not be contended that the seamen from the "Speedwell" are entitled to any consideration for their services in their attempts to save the vessel and property on board before the master abandoned the voyage any further than the property saved furnishes means for payment of their wages. Their exertions were due to the ship by virtue of their contract. They are bound to exert themselves to the utmost to save the vessel and cargo from peril.

In the case of the "Neptune," 1 Hagg., 236, Lord Stowell said: "The crew of a vessel cannot be salvors, for it is their duty to protect the ship through all perils, and whose entire possible service for this purpose is pledged to that extent." In the 10th

of Peter's, 122, Mr. Justice Story, after adverting to this opinion of Lord Stowell, says, "that is must be admitted that, however harsh the rule may seem to be in its actual application to particular cases, it is well founded in public policy, and strikes at the root of those temptations which might otherwise exist to an alarming extent to induce pilots and others to abandon their proper duty that they might profit by the distress of the ship which they were bound to navigate." There has been a difference of opinion in cases of shipwreck, when property is secured by the exertions of the crew, whether the allowance of wages should be put upon the grounds of a qualified salvage, or fixed by the terms of the contract, but if the compensation for this qualified salvage is controlled by the contract, the distinction ceases to be of importance. When, however, the contract ceases to be binding on the seaman, he then may become a salvor, although the voyage has not been completed. His relation to the vessel must be dissolved, and he must be exonerated from further duties. This principle was recognized in the case of the "Natchez" by this Court, and the same doctrine is sustained in the case of the "Blaireau," 2 Cranch, 268 ; Hobart *vs.* Drogan, 14 Peter's, 122. 

It is further contended that they are entitled at least to salvage for their services in saving the vessel and property on board, after the sale by the master, and the delivery of the vessel to the purchasers, for there was nothing more for the seamen to do under their contract, as the voyage was abandoned by the master. It appears that Richard Cumings, M. Fayal and Frederick Burrmeister, and Joe Marias, rendered services in saving the vessel and cargo for twenty-two days, at the request of the purchasers. There seems to be no precise terms agreed upon. The men testify that if they saved the ship and oil they were to be paid well. It appears further that these men served on board of the vessel from Scammon's Lagoon to Lahaina, doing seamen's duty, so that they were in service from the 5th of February, the day of sale, till their arrival in Lahaina on the 10th of April. Payments were made at Lahaina of $20 each, and a present to Burrmeister in addition, as he was regarded especially as an efficient man. And the purchasers say

that the seamen were satisfied with this amount, and gave them a receipt in full.

Courts of Admiralty regard it as their duty to re-examine settlements of this character, and the question arises : What is an equitable compensation for the services rendered ? It was hard and severe service for the twenty-two days. What they were doing the balance of the time does not appear, until they sailed, which was on the 9th of March. They were at work night and day, watch and watch, a portion of the time—six nights probably. Captain Cornell states that " these men came on board the ' Martha ' and the others on the ' Speedwell ' to the islands. I told them they might go in my vessel or in the ' Speedwell ' and I would give them $20, and I paid them that amount, and they expressed themselves satisfied." He says that he promised them $20, but cannot tell at what place the prom- ise was made, whether at the lagoon or Turtle Bay. There is no evidence that it was made at the commencement of the work, and therefore it is not at all strange· that a misunder- standing should arise. In the case of Hussey *vs.* Fields *et als.*, owners of the " Rambler " of Nantucket, Judge Sprague, the distinguished Judge of the District Court of the United States for the Massachusetts District, says, " that when a whaling voyage is broken up by a disaster in a foreign port, the master on request of the seamen is authorized to deliver to them their share of the oil on the spot, although by the shipping articles the distribution of the proceeds was to be made after the re- turn to the home port." When the oil is here in which the seaman is interested, and the advances made here, there is every reason that the settlement should be made here. It is espe- cially desirable in all cases for parties to adjust their own dif- ferences, particularly where a small amount is involved. It is not singular, however, that this case should have been pre- sented to the consideration of the Court. It involves some in- teresting questions of the rights of seamen to enforce their lien on the catchings, and on the property wrecked, after the con- tract is dissolved, and they are exonerated from any further duty by virtue of it, as well as for the value of their services after its termination. A still further question sometimes arises as to the liability of owners for extra wages, which involves the

further question whether the damage to the vessel was so great as to make it necessary to break up the voyage and sell the wreck. The contract was mutual, and neither had any right to defeat it.

A settlement in the cases referred to can not be to the detriment of the owners. It relieves them from all care and responsibility in the shipment and sale, and final adjustment.

In this case the legal principle is of little consequence, but as the counsel have presented it to my consideration with so much care and ability, I felt it my duty to give these views upon it.

The libellants do not present a case of any particular merit for salvage services. They did not encounter exposure or peril. There are no circumstances in the case to enhance the value of the labor by reason of any extraordinary and hazardous exertions.

In view of all the circumstances of the case, of their advances at the port of Honolulu, and of the quantity of oil taken since last autumn, and saved in part by them, and of their labor in saving the vessel and property attached, the Court hereby decree that Cumings, Burrmeister, Joe Maria and Fayal shall be paid forty dollars each. The payments which they received are in full compensation for all their other services at Seaman's Lagoon, and as seamen on board the vessel to Lahaina. If either of them has not received $20 for this service, he is entitled to it.

As to the claim of the other libellants, there is no evidence to support it.

Costs to the libellants.

Mr. Montgomery and Mr. Harris for libellants.

Mr. Bates for claimants.