Dennis J. BALDASSARO,
Plaintiff–Appellant,

v.

UNITED STATES of America,
Defendant–Appellee.

No. 94–30605.

United States Court of Appeals,
Fifth Circuit.

Sept. 15, 1995.

Lawrence D. Wiedemann, John Denenea, Jr., Wiedemann & Wiedemann, New Orleans, LA, for appellant.

Michelle T. Delemarre, U.S. Dept. of Justice, Trial Atty., David V. Hutchinson, Asst. Dir., Admiralty, Washington, DC, Eddie J. Jordan, Jr., Nancy A. Nungesser, U.S. Attys., New Orleans, LA, Rick Gonzalez, U.S. Dept. of Transp., Maritime Admin., Washington, DC, for appellee.

Before REAVLEY, KING and WIENER, Circuit Judges.

WIENER, Circuit Judge:

Plaintiff–Appellant Dennis J. Baldassaro appeals a district court order granting summary judgment in favor of Defendant–Appellee the United States of America, dismissing Baldassaro's maritime personal injury action on the ground that the "discretionary function exception" bars his negligence claim against the United States. Baldassaro also appeals the district court's amended judgment to the extent that it rejects his contention that the United States should pay him more than the $8.00 daily maintenance benefit stipulated in his Union's collective bargaining agreement (CBA). Finding no reversible error in either ruling, we affirm.

## I

## FACTS AND PROCEEDINGS

As a Jones Act seaman and member of the Seafarer's International Union, Baldassaro sued his employer, the United States of America, for injuries sustained while working aboard the Cape Carthage, a vessel assigned to the Ready Reserve Force (RRF) component of the National Defense Reserve Fleet (Fleet). While climbing into his upper bunk in the summer of 1991, Baldassaro fell to the deck when the part of the detachable sea rail located at the foot of his bunk separated from the bunk. Baldassaro filed suit against the United States pursuant to the War Shipping Administration Act[1] and the Suits in Admiralty Act (SAA),[2] alleging negligence in failing to secure the railing. He also claimed that the daily maintenance benefit of $8.00 stipulated in his CBA and paid to him while he was unable to work was insufficient to fulfill its purpose of providing a seaman with food and lodging comparable to that aboard ship.

The district court granted summary judgment for the United States, concluding that, as the decision to place the Cape Carthage in the RRF was a "discretionary function" within the scope of the discretionary function exception, the United States was immune from suit. Subsequently, the district court amended its judgment to uphold the $8.00 daily maintenance benefit.

## II

## ANALYSIS

A. STANDARD OF REVIEW

We review a grant of summary judgment using the same standards that guide the

---

**1.** 50 U.S.C. app. § 1291 (1981).

**2.** 46 U.S.C. app. § 741–52 (1987).

district court.[3]  Summary judgment is appropriate when no issue of material fact exists and the movant is entitled to judgment as a matter of law.[4]  Questions of law are reviewed de novo.[5]

## B.  DISCRETIONARY FUNCTION EXCEPTION

Baldassaro first contends that the district court improperly dismissed his claim based on the discretionary function doctrine.  Baldassaro maintains that the United States' decision to equip the bunks on the Cape Carthage with detachable sea rails is not a discretionary function immune from judicial scrutiny, as the design decisions regarding the bunks and sea rails were not based on policy considerations.  Baldassaro asserts that the United States has advanced no legitimate social, economic, or political policies that guided its decision to equip the bunks on the Cape Carthage with detachable sea rails.  And he insists that the only applicable consideration—safety—is an inappropriate basis on which to apply the discretionary function exception.

■  The discretionary function exception is set forth in the Federal Tort Claims Act (FTCA).  It limits the United States' waiver of sovereign immunity under the Act by providing that the waiver will not apply to:

[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based

upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.[6]

Although the SAA does not contain an express discretionary function exception to its waiver of sovereign immunity, we recognize that the FTCA's exception is "implicit in private suits brought against the United States Government under the Suits in Admiralty Act."[7]

■  The exception covers only acts that " 'involv[e] an element of judgment or choice;' "[8]  thus " 'it is the nature of the conduct, rather than the status of the actor,' that governs whether the exception applies."[9]  As the purpose of the exception is to " 'prevent judicial "second guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort,' "[10] it " 'protects only governmental actions and decisions based on considerations of public policy.' "[11]

Recently, in *United States v. Gaubert*,[12] the Supreme Court held that, "when established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion."[13]  The Court de-

---

**3.**  *Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir.1988).

**4.**  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

**5.**  *Walker*, 853 F.2d at 358.

**6.**  28 U.S.C. § 2680(a) (1990).

**7.**  *Wiggins v. United States Through Dep't of Army*, 799 F.2d 962, 966 (5th Cir.1986).

**8.**  *United States v. Gaubert*, 499 U.S. 315, 322, 111 S.Ct. 1267, 1273, 113 L.Ed.2d 335 (1991) (citing *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988)).

**9.**  *Id.* (citing *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 813, 104 S.Ct. 2755, 2764, 81 L.Ed.2d

660 (1984), *reh'g denied*, 468 U.S. 1226, 105 S.Ct. 26, 82 L.Ed.2d 919 (1984)).

**10.**  *Id.* at 323, 111 S.Ct. at 1273 (citing *Varig Airlines*, 467 U.S. at 814, 104 S.Ct. at 2765).

**11.**  *Id.* at 323, 111 S.Ct. at 1273; *Berkovitz*, 486 U.S. at 536–537, 108 S.Ct. at 1958–1959 (principles guiding application of discretionary function exception include whether action is matter of choice for acting employee and whether judgment is of kind that discretionary function exception was designed to shield).

**12.**  499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991).

**13.**  *Id.* at 324, 111 S.Ct. at 1274 ("[I]f a regulation allows the employee discretion, the very existence of the regulation creates a strong presump-

termined that, in light of this presumption, to survive a motion to dismiss based on the discretionary function exception a complaint "must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime."[14] The Court noted that, in determining whether the discretionary function exception bars a suit against the government, the focus of the inquiry is on the nature of the action taken and on whether that action is susceptible to policy analysis.[15]

### 1. *Nature of the Decision*

The Fleet was established by Section 22 of the Merchant Ship Sales Act of 1946 to serve as a reserve fleet that could be activated to meet the United States' shipping requirements during national emergencies.[16] The Fleet and its RRF component consist of *"those vessels* owned or acquired by the United States Government that the Secretary of Transportation, after consultation with the Secretary of the Navy, *determines* are of value for national defense purposes and that the Secretary of Transportation *decides* to place and maintain in the fleet."[17] Clearly, as is reflected in the language of the statute, the Merchant Ship Sales Act authorizes and requires the Secretary of Transportation to exercise his discretion in determining which vessels are to be included in the Fleet and its

RRF component. Consequently, as the act of selecting or approving a particular ship for the Fleet or the RRF involves an element of judgment or choice, that act, standing alone, satisfies the first prong of the discretionary function exception standard.

Taking our analysis a step further and focusing on the act of equipping the bunks on the Cape Carthage with detachable sea rails, we note first that there are no statutes, regulations, policies, guidelines, or Maritime Administration (MARAD) standards that require sea rails to be attached permanently to the bunks on RRF vessels.[18] As there were no such specifications, it follows that the decisions regarding the design of the Cape Carthage's bunks and sea rails were within the discretion of the United States. Second, although unnecessary in light of the absence of a statutory mandate requiring permanently attached sea rails, our review of the history of the Cape Carthage further convinces us that the design for the bunks on board the vessel was a discretionary act for purposes of the exception.

The Cape Carthage was constructed in the 1960's by Lykes Brothers Steamship Company, Inc. (Lykes) under the Title V Construction Subsidy Program.[19] The subsidy program was enacted to (1) encourage ship owners to have their ships built by American labor and (2) ensure that the United States

---

tion that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.")

**14.** *Id.* at 324–25, 111 S.Ct. at 1274–1275.

**15.** *Id. See ALX El Dorado, Inc. v. Southwest Sav. & Loan Ass'n/FSLIC*, 36 F.3d 409, 411–12 (5th Cir.1994) (emphasizing *Gaubert* presumption and concluding that complainant failed to allege that statutory discretion exercised by banking agency was not based on considerations of public policy); *State of La. v. Public Investors, Inc.*, 35 F.3d 216, 220–21 (5th Cir.1994) ("There is a presumption that when government employees exercise discretion given to them by a statute or regulation, they are doing so based on the same policy concerns that animate the controlling statute or regulation itself.").

**16.** 50 U.S.C. app. § 1744 (1995). *See also* 50 U.S.C. app. § 1735(a) (1981) (declaration of policy for Merchant Ship Sales Act of 1946)

(a) It is necessary for the national security and development and maintenance of the domestic and the export and import foreign commerce of the United States that the United States have an efficient and adequate American-owned merchant marine ... capable of serving as a naval and military auxiliary in time of war ... composed of the best-equipped, safest, and most suitable types of vessels ...
*Id.*

**17.** 50 U.S.C. app. § 1744(a) (1995) (emphasis added). The administration and operation of the RRF is governed by an agreement between the United States Navy and the Maritime Administration (MARAD).

**18.** *See, e.g.,* Coast Guard Dept. of Transp.—Accommodations for Officers and Crew, 46 CFR Sub. Ch. 1 § 92.20–20 (1990) (listing requirements for sleeping accommodations for officers and crew).

**19.** *See* 46 U.S.C. app. § 1151 et seq. (1987).

had an adequate merchant marine in times of national emergency. Eligibility under the program required Lykes to develop and construct a ship that satisfied MARAD standards. Lykes submitted specifications to build a C3–S–37c, the standard for a combination bulk and general cargo ship. This particular design included specifications for crew furniture that complied with the MARAD's furniture design standards, which were contained in two books of drawings of different designs of crew furniture.

Although the MARAD standards depicted bunk beds with detachable sea rails, shipbuilders were not required to build exact replicas of those designs. Shipbuilders could have submitted—and MARAD could have approved—designs that were "equal" to the MARAD standards, including bunks designed with permanently attached sea rails. In fact, at the time the Cape Carthage was built, there was a different bunk design that specified a very shallow bed pan which housed the mattress and required permanently attached sea rails. Even though this bunk design was considered too new and too expensive in the 1960's, it was both an option that the shipbuilder could have included in its specifications and an alternative design that MARAD would have approved. The record reveals, however, that detachable sea rails were—and still are—the standard in most United States and foreign ships; and even though these rails can be used as hand rails, they are installed primarily to protect the occupant from rolling and sliding out of the bunk during heavy weather.

Adhering to customary practice, Lykes submitted—and MARAD approved—plans to equip the Cape Carthage with detachable sea rails. In 1984, after conducting a joint survey of the Cape Carthage to ensure that it met MARAD's standards and was suitable for the Department of Defense's purposes, MARAD purchased the vessel from Lykes and assigned it to the RRF. As the decision to equip the vessel with detachable rails was optional—albeit standard practice and in compliance with MARAD's general standards—it follows that the decision was in fact a discretionary act.

### 2. Policy Analysis

Having concluded that the decision to equip the Cape Carthage with detachable sea rails was a discretionary act, our next inquiry is whether that decision was based on considerations of public policy. Baldassaro contends that the discretionary function exception does not apply in any given situation unless the discretionary act is one that was actually balanced against social, economic, and political concerns. He maintains that this balancing process is a *necessary prerequisite* in applying the exception and argues that in this instance the government has not advanced any theory that even remotely relates to a social, economic, or political policy. We are convinced that Baldassaro misapprehends the discretionary function exception and the Supreme Court's recent decision permitting a presumption of policy.

Baldassaro relies in part on *Moyer v. Martin Marietta Corporation*,[20] in which we held that the discretionary function exception did not apply to a particular design for an ejection seat in a military aircraft. We recognized that the exception would apply to both the selection of the aircraft and the number of aircraft to be purchased, but refused to extend the exception to immunize the government's acceptance of a system of the aircraft.[21] We distinguish *Moyer*, not on its facts, but on the jurisprudence that has evolved during the twenty-two years that have elapsed since that opinion was written. It was decided in 1973, long before the Supreme Court expressed its willingness to presume that the discretionary acts flowing from a policy-based statute are grounded in the same policy considerations that underlie the statute. For the reasons expressed, we are satisfied that, in light of post-*Moyer* developments, the discretionary function exception *does* extend to the discretionary act of design reviewed today.

---

20. 481 F.2d 585 (5th Cir.1973).

21. *Id.* at 598.

Baldassaro distinguishes *Gordon v. Lykes Brothers Steamship Co., Inc.*,[22] in which we held that the government's decision to build and use ships with asbestos at a time of war and subsequent to that war was protected by the discretionary function exception. He reasons that, despite the fact that the Cape Carthage was activated during Operation Desert Storm in 1990, the policy considerations inherent in acquiring military vessels at a time of war did not exist when the Cape Carthage was purchased in 1984. Although we agree with that factual distinction, we note that in *Gordon* we observed—and apparently were influenced by—the fact that, as here, the government had provided historical evidence that the its action was consistent with its policy and its existing standard design.[23] Even if the facts of *Gordon* can be distinguished from the facts of this case based on imminent and actual war-time conditions, we remain convinced that post-*Gordon* developments support our conclusion that the discretionary function exception does apply in this instance.

Baldassaro also distinguishes *Boyle v. United Technologies Corp.*,[24] arguing that, in contrast to the nonexistent policy factors that underlie decisions regarding the design of bunks on RRF vessels, the design and decision making process for *military equipment,* i.e., a co-pilot emergency escape hatch system for a military helicopter, is clearly based on social, economic and political policy factors.[25] Again, for the reasons expressed, we are convinced that the government's design decisions in this instance are capable of being influenced by policy considerations.

■■ The Supreme Court's seminal decision in *United States v. Gaubert*[26] instructs that when established government policy allows a government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when he exercises that discretion. As the Supreme Court noted, the appropriate inquiry is whether the act in question is *"susceptible to policy analysis."*[27] We are satisfied that the MARAD ship design decisions for vessels of the RRF, including *inter alia* whether to install detachable sea rails on vessels such as the Cape Carthage, involve the weighing of competing policy considerations that the discretionary function exception protects from judicial scrutiny. Baldassaro disagrees, arguing that policy considerations such as expense, appearance, safety, comfort, practicability and function are not social, economic, or political considerations of a governmental nature. As we observed above, however, the declaration of policy for the act authorizing the RRF states that it is necessary for national security to have an efficient and adequate merchant marine composed of the best-equipped, safest, and most suitable vessels.[28] Certainly this stated policy encompasses the considerations espoused by the government, and casts these considerations in a light distinguishable from those of an ordinary purchaser.

The decision to use detachable sea rails was but one of myriad details that added up to the total ship design eventually approved by MARAD as an exercise of its discretion in selecting vessels that it determined were of value for national defense. We venture that almost any exercise of governmental discretion could be overly parsed so as to focus on minute details of sub-decisions to the point that any relationship to policy would appear too attenuated. But doing that obscures the very purpose of the discretionary function exception. Clearly, that purpose is to prevent judicial "second-guessing"[29] of decisions arising from and grounded in policy. We are neither in a position—nor do we desire to

**22.** 835 F.2d 96 (5th Cir.), *cert. denied,* 488 U.S. 825, 109 S.Ct. 73, 102 L.Ed.2d 50 (1988).

**23.** *Id.* at 100.

**24.** 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988).

**25.** *See id.* at 511, 108 S.Ct. at 2518 ("[T]he selection of the appropriate design for military equipment to be used by our Armed Forces is assured-

ly a discretionary function within the meaning of [the exception].").

**26.** 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991).

**27.** *Id.* at 325, 111 S.Ct. at 1275 (emphasis added).

**28.** *See supra* n. 16.

**29.** *Gaubert,* 499 U.S. at 323, 111 S.Ct. at 1273.

be—to dissect and second-guess each discreet aspect of a total design package that is grounded in policy considerations pertaining to national defense. Indeed, such tunnel-visioned analyses would render the discretionary function exception nugatory and open virtually every decision that implements a governmental policy to liability under some waiver of sovereign immunity.

More precisely, the burden is on Baldassaro to allege facts that would support a finding that the challenged action is not the kind of conduct that can be said to be grounded in the policy of the regulatory regime.[30] Baldassaro conclusionally asserts that the government's decision regarding the design of the sea rails was not rooted in any social, economic, or political policies. What he has failed to do, however, is to present specific facts sufficient to rebut the presumption that the particular design decision was grounded in the same policy considerations that underlie the statute authorizing the United States to exercise its discretion in determining which vessels are of value for national defense. Consequently, his challenge of the district court's summary judgment dismissal based on the discretionary function exception cannot succeed.

C. MAINTENANCE BENEFIT

■ Baldassaro also contends that the daily maintenance benefit, consisting of $8.00 a day during the time he was unable to work, was insufficient. The duty to provide maintenance attaches once the seaman enters the service of the ship and it is "a duty that no private agreement is competent to abrogate."[31] The rate at which maintenance is to

be paid is supposed to reflect the cost of food and lodging in a particular area, comparable to that received on board the vessel.[32] The right to maintenance cannot be abrogated, but it can be modified and defined by contract. "[T]here is a fundamental difference between contractual regulation of the rate of maintenance payments and contractual elimination of such payments altogether."[33] Baldassaro claims that $8.00 a day is unreasonable and so insufficient as to abrogate his right to maintenance.

■ In a similar case the Third Circuit accepted the argument made by Baldassaro in this case and concluded that a seaman is not bound by a maintenance rate set in a CBA if he can show higher daily expenses.[34] The court relied on the principle announced in De Zon, indicating that a maintenance rate could be so low as to abrogate it, and the court relied on its conclusion that the labor laws do not preempt the traditional doctrine of maintenance rights. The court therefore concluded that the traditional doctrine allowing for maintenance could require a court to ignore the terms of a CBA.[35]

Three other circuits have rejected this rationale and held that the CBA or contract controls.[36] This Circuit has not addressed this issue. We have awarded higher maintenance rates to seamen when there was no union contract.[37]

We agree with the First, Sixth and Ninth Circuits. As the Ninth Circuit noted in *Gardiner*, "Congress viewed collective bargaining as a key instrument in its effort to promote industrial peace ... [T]his court will

---

**30.** *Id.* at 324–25, 111 S.Ct. at 1274–75.

**31.** *De Zon v. American President Lines*, 318 U.S. 660, 667, 63 S.Ct. 814, 818, 87 L.Ed. 1065 (1943), *reh. denied*, 319 U.S. 780, 63 S.Ct. 1025, 87 L.Ed. 1725 (1943).

**32.** *Tate v. American Tugs, Inc.*, 634 F.2d 869, 870 (5th Cir.1981).

**33.** *Dowdle v. Offshore Express, Inc.*, 809 F.2d 259, 263–64 (5th Cir.1987).

**34.** *Barnes v. Andover Co., L.P.*, 900 F.2d 630, 640 (3rd Cir.1990).

**35.** *Id.*

**36.** *See Al–Zawkari v. American S.S. Co.*, 871 F.2d 585 (6th Cir.1989) (upholding $8.00/day maintenance rate); *Macedo v. F/V Paul and Michelle*, 868 F.2d 519 (1st Cir.1989) (upholding $10.00/day maintenance rate); *Gardiner v. Sea–Land Serv., Inc.*, 786 F.2d 943 (9th Cir.) (upholding $8.00/day maintenance rate), *cert. denied*, 479 U.S. 924, 107 S.Ct. 331, 93 L.Ed.2d 303 (1986).

**37.** *See e.g., Morel v. Sabine Towing & Transp. Co., Inc.*, 669 F.2d 345 (5th Cir.1982) ($20.00/day awarded); *Caulfield v. AC & D Marine, Inc.*, 633 F.2d 1129 (5th Cir.1981) (non-union seaman, $15.00/day awarded).

not lightly embrace the repudiation of contractual obligations enumerated in a collective bargaining agreement and will 'choose the rule that will promote the enforcement of collective bargaining agreements.' " [38]  As in *Gardiner*, there is no allegation in this case that the CBA as a whole is unfair or that this seaman was not adequately represented by the Union.  "The adequacy of the maintenance rate should not be examined in isolation by the court because the determination of its adequacy in relation to the whole scheme of benefits has already been made by the union and the seamen who voted for the contract." [39]

In conclusion, we affirm the district court's dismissal of Baldassaro's negligence claim as barred by the discretionary function exception, and the court's amended judgment with respect to Baldassaro's maintenance claim.

AFFIRMED.

38. *Gardiner,* 786 F.2d at 948 (citation omitted).  39. *Id.* at 949.