PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-3553
_____

JAMES L. JOYCE,
Appellant

v.

MAERSK LINE LTD
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-13-cv-05566)
District Judge:  Hon. Esther Salas
_____

Argued
October 18, 2017

Before:  SMITH, *Chief Judge*, McKEE, AMBRO,
CHAGARES, JORDAN, HARDIMAN, GREENAWAY, JR.,
VANASKIE, SHWARTZ, KRAUSE, RESTREPO, and
ROTH, *Circuit Judges*.

(Opinion Filed: December 4, 2017)
_____

Dennis M. O'Bryan, Esq.  [ARGUED]
O'Bryan Baun Karamanian
401 South Woodward Avenue
Suite #463
Birmingham, MI  48009
        *Counsel for Appellant*

John J. Walsh, Esq.   [ARGUED]
Freehill Hogan & Mahar
80 Pine Street
New York, NY  10005
        *Counsel for Appellee*

Martin J. Davies
Tulane University Law School
6329 Freret Street
Weinmann Hall, Room 255-F
New Orleans, LA  70118
        *Amicus Curiae*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Today we stop swimming against the tide of opinion on an important question of maritime law.  Following the lead of several of our sister circuits, we now hold that a union contract freely entered by a seafarer – a contract that includes rates of maintenance, cure, and unearned wages – will not be reviewed piecemeal by courts unless there is evidence of

unfairness in the collective bargaining process. In so holding, we overrule our decision in *Barnes v. Andover Co., L.P.*, 900 F.2d 630 (3d Cir. 1990).

## I.    Background

The facts of this case are not in dispute. James Joyce was a member of the Seafarers International Union. He signed "Articles of Agreement" with the shipping company Maersk Line Limited and agreed to serve as a bosun aboard the MAERSK OHIO for a three-month period, from September 18, 2012 until December 18, 2012. The Union and Maersk had reached a collective bargaining agreement that governed the terms of all unionized seafarers' employment with Maersk. The collective bargaining agreement was incorporated by reference into the Articles of Agreement between Joyce and Maersk.

Not long after the MAERSK OHIO departed as scheduled from the Port of Newark, New Jersey, Joyce fell ill. He was examined onboard and diagnosed with kidney stones. That diagnosis was later confirmed at a hospital in Spain, and he was declared unfit for duty and repatriated to the United States.

The collective bargaining agreement provided that, if a seafarer was medically discharged prior to the conclusion of his contract, he was entitled to unearned wages for the remaining period of the contract. Overtime was not included in the definition of unearned wages. Joyce accordingly received only base pay as unearned wages for the time left on his contract after he was medically discharged.

3

Dissatisfied, Joyce filed a putative class action in the United States District Court for the District of New Jersey. He alleged that the "portions of the [collective bargaining agreement] governing unearned wages ... violated general maritime law[.]" *Joyce v. Maersk Line, Ltd.*, No. 13-5566, 2016 WL 3566726, at *1 (D.N.J. June 30, 2016). More particularly, he claimed that he was owed overtime pay.[1] *Id.* at *2. The District Court disagreed and granted summary judgment to Maersk on the ground that, as a matter of law, given the collective bargaining agreement, Joyce was not entitled to overtime. *Id.* at *6-7. In doing so, the Court distinguished our decision in *Barnes*. *Id.* We had said in that case that the specifics of what is covered by a seafarer's right to "maintenance" – traditionally, the right to food and lodging expenses – could be modified by a court, even if

---

[1] It may seem odd to assert that overtime pay is owed for overtime not worked, but there is precedent for Joyce's assertion that overtime a seafarer expected to work but was unable to because of illness or injury is pay that should be included in unearned wages. *See Padilla v. Maersk Line, Ltd.*, 721 F.3d 77, 82 (2d Cir. 2013) (recognizing that, where "much of [a seafarer's] income was derived from overtime compensation," an injured seafarer could recover overtime as unearned wages because he "was entitled to recover in full the compensation that he would have earned 'but for' his injury"); *Lamont v. United States*, 613 F. Supp. 588, 593 (S.D.N.Y. 1985) (holding that where the "apparent custom and practice" of seafarers was to work a substantial amount of overtime, an injured seafarer was "entitled to recover, in full, the compensation that he would have earned but for his illness or injury").

4

those specifics were established in a collective bargaining agreement. *Barnes*, 900 F.2d at 640.

Joyce now asks us to overturn the District Court's ruling on unearned wages.[2] Because seafarers were entitled at common law to both maintenance and unearned wages, he argues that our holding in *Barnes* should extend to unearned wages set by a collective bargaining agreement, making the union contract subject to change by court order to conform with traditional maritime law. His appeal presents an opportunity for us to reconsider our holding in *Barnes*.[3]

## II.     Standard of Review

Because the District Court granted Maersk's motion for summary judgment, we review its determination *de novo*, applying the same standard that it applied. *Shelton v. Bledsoe*, 775 F.3d 554, 559 (3d Cir. 2015). A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[2] Joyce had also brought suit based on the Shipowners' Liability Convention and the daily per diem maintenance rate under the collective bargaining agreement. Although the District Court ruled against him on those claims too, he does not appeal those rulings here.

[3] We thank Professor Martin J. Davies of Tulane University Law School for his insightful amicus brief discussing *Barnes* and the questions of maritime law before us.

56(a). There are no factual disputes at all in this case. Instead, we are faced with a pure question of law: whether, on the agreed facts, Maersk was entitled to judgment based on the collective bargaining agreement. Our review is thus plenary. *See McCann v. Newman Irrevocable Tr.*, 458 F.3d 281, 286 (3d Cir. 2006) (explaining that we exercise plenary review over questions of law).

## III.  Discussion[4]

### A.  *Review of* Barnes v. Andover Co., L.P.*, 900 F.2d 630 (3d Cir. 1990)*

Joyce's argument relies heavily on our holding in *Barnes*, so we turn to it first. The question in that case was whether a seafarer was bound by the maintenance rate set in a collective bargaining agreement between the shipowner and the seafarers' union. *Barnes*, 900 F.2d at 631. We began our analysis by recognizing the deeply rooted duty at common law for a shipowner to pay a seafarer's maintenance. *Id.* at 633. "Maintenance is the living allowance for a seaman while he is ashore recovering from injury or illness." *Id.* It derives from medieval maritime laws and has long been recognized by American courts. *Id.* The right to "cure," which is payment for "medical expenses incurred in treating the seaman's injury or illness[,]" has the same origin. *Id.*

The duty to pay maintenance and cure arose from what was viewed as the "peculiarity" of seafarers' lives. *Id.*

---

[4] The District Court had jurisdiction under 28 U.S.C. § 1333. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

6

Justice Story explained the views of society at the time: "[seamen] are generally poor and friendless, and acquire habits of gross indulgence, carelessness, and improvidence." *Id.* (quoting *Harden v. Gordon*, 11 F. Cas. 480, 483 (C.C.D. Me. 1823) (No. 6,047)).  Thus, "[i]f some provision be not made for them in sickness at the expense of the ship, they must often in foreign ports suffer the accumulated evils of disease, and poverty, and sometimes perish from the want of suitable nourishment."  *Id.* (quoting *Harden*, 11 F. Cas. at 483).  By imposing the duty on shipowners to pay for maintenance and cure, "the interest of the owner will be immediately connected with that of the seamen."  *Id.* (quoting *Harden*, 11 F. Cas. at 483).  That arrangement benefitted both seafarers and owners – the former had the benefit of someone "watch[ing] over their health with vigilance and fidelity," and the latter had employees who were "urge[d] ... to encounter hazards in the ship's service."  *Id.* (quoting *Harden*, 11 F. Cas. at 483).

Those duties remain in maritime law.  Indeed, in *Barnes* we observed that, besides being long entrenched in maritime law, the responsibility to pay maintenance and cure has been "construed liberally" and "consistently expanded" by the courts.  *Id.*  The scope of that responsibility extends "beyond injuries sustained on board ship or during working hours" and is in force "until the seaman has reached the point of maximum cure."  *Id.* at 633-34.  The right to maintenance and cure exists "regardless of ... fault" by the seafarer.  *Id.* at 633.  Only in cases of willful misconduct has a seafarer been held to be outside the scope of the right.  *Id.*

With that background, we directed our attention to the central question in *Barnes*, namely whether a contract that

7

established a maintenance rate was binding on a union member. *Id.* at 631. The contract at issue established a rate of maintenance of $8 per day. *Id.* at 632. We held that it was "inconsistent ... with the traditional doctrine of maintenance" to say that the rate in a union contract "is binding on a seaman who can show higher daily expenses." *Id.* at 640. We therefore analyzed the $8 per day rate and determined it to be inadequate. *See id.* at 644 (concluding that the maintenance award should include "expenses actually incurred or paid in connection with ... permanent lodging," including "gas and electric bills" and "home insurance" but not "automobile expenses and toiletries").

In reaching that conclusion, we acknowledged that we were departing from the reasoning of three other United States Courts of Appeals – the First, Sixth, and Ninth Circuits – which had faced the same question but decided the matter differently. *Id.* at 635. Those other courts had determined that the "contractual rate should be binding so long as the collective bargaining process ha[d] been fair and the rate of maintenance ha[d] been subject to real negotiation." *Id.* (citing *Gardiner v. Sea-Land Serv., Inc.*, 786 F.2d 943, 949 (9th Cir. 1986)). They recognized that federal labor laws did not directly preempt maritime law on maintenance, but they saw the policy behind national labor laws as sufficiently weighty and clear to prevent courts from modifying a bargained-for rate of maintenance in a union contract. *Id.*

*Barnes* explicitly rejected that reasoning.[5] Although we indicated "sympath[y] with an approach that would

---

[5] We did agree, however, that the union contract was not directly preempted. *See Barnes*, 900 F.2d at 637-39.

encourage the use and reliability of collective bargaining agreements," we believed it was not well-founded in law. *Id.* at 640. We declared that we "kn[e]w of no basis for permitting such contracts to override a common law maritime right of a seaman that has not been preempted by the labor laws." *Id.* Therefore, we said, "unless Congress determines that the circumstances giving rise to the need for maintenance have changed and that collective bargaining is now a more appropriate way to deal with the issue of the ill or injured seaman, the common law remedy must remain in full force." *Id.*

We placed a caveat on our holding, however, noting that unions and shipowners could "agree on what they believe is a realistic rate of maintenance with the expectation that the parties would voluntarily abide by that rate and thereby avoid litigation." *Id.* Somewhat incongruously, though, we then immediately approved the frustration of such expectations by saying that the plaintiff in *Barnes* had "met his common law burden of producing evidence ... that the $8 rate was insufficient to provide him with food and lodging." *Id.* Hence, the bargained-for rate was set aside. *Id.*

### B. *Joyce's Argument*

Joyce argues that *Barnes* allows us to hold that he is entitled to overtime pay in his unearned wages. His logic proceeds in three steps. First, he says that the seafarer's right to unearned wages dates back almost a thousand years and should be treated exactly like the right to maintenance. Second, he claims that overtime pay has consistently been a part of the common law right to unearned wages. Third, Joyce connects the first two steps to *Barnes*: an unearned

9

wage rate set in a collective bargaining agreement can be set aside when there is evidence that it is insufficient, as was the maintenance rate in *Barnes*.

We do not take issue here with Joyce's first assertion. There is ample evidence that, at common law, seafarers were and still are entitled to unearned wages. *See Vaughan v. Atkinson*, 369 U.S. 527, 535 n.2 (1962) (Stewart, J., dissenting) (collecting cases for the proposition that "[t]he earliest codifications of the law of the sea provided for medical treatment and wages for mariners injured or falling ill in the ship's service."); *see also Flores v. Carnival Cruise Lines*, 47 F.3d 1120, 1122 (11th Cir. 1995) (recognizing that unearned wages were historically part of the relief sought in an action for cure and maintenance). There is less of an historical anchor, though, for the second step in Joyce's argument, that the common law right to unearned wages includes overtime. Nonetheless, that proposition is sound. Wage rates for ancient mariners were typically set by contract in an agreement then known as the shipping articles, and the general rule was that "[t]he stipulation in the shipping articles [was] conclusive as to wages[,] and no more [could] be recovered on any special promise to pay for severe or extra labor or exposure in the course of duty[.]" 1 Theophilus Parsons, *A Treatise on Maritime Law* 447-48 (1859) (footnote omitted). A seafarer's right to his "full wages," *The R.R. Springer*, 4 F. 671, 672 (S.D. Ohio 1880), therefore meant recovery only of the amount stipulated in the articles. Gradually, however, that recovery broadened to encompass "the full amount reasonably expected by the parties to be paid during the voyage." *Lamont v. United States*, 613 F. Supp. 588, 593 (S.D.N.Y. 1985). Modern courts have therefore included tips, *Flores*, 47 F.3d at 1122-25, and accumulated

10

time off, *Lipscomb v. Foss Mar. Co.*, 83 F.3d 1106, 1109-11 (9th Cir. 1996), as part of the unearned wage remedy under general maritime law. Thus, today, as long as the parties' "reasonable expectation includes 'overtime,'" *Lamont*, 613 F. Supp. at 593, and such wages are "not speculative," *Padilla v. Maersk Line, Ltd.*, 721 F.3d 77, 82-83 (2d Cir. 2013), they are recoverable. *See id.* at 82 (awarding payment for overtime as part of unearned wages for seafarers who fell ill because "it was the custom and practice for seafarers ... to derive substantial income from overtime compensation and that, consequently, such compensation was a common expectation of both the seamen and of [the shipowner]"); *see also Shaw v. Ohio River Co.*, 526 F.2d 193, 199 (3d Cir. 1975) (noting that accumulated leave time is a component of wages).

There is undeniable wisdom to an approach that looks to the expectations of the parties when delimiting the unearned wage remedy of a seafarer. When overtime is a "common expectation" and the seafarer's entitlement to it is "essentially undisputed," *Padilla*, 721 F.3d at 82, overtime can be considered merely "wages the seaman would have earned" absent injury, *Barnes*, 900 F.2d at 634 n.2.

If we were to follow *Barnes*, then, Joyce would likely be correct on the third point of his argument as well; we would be hard-pressed to say that courts have no power to modify unearned wage rates established by collective bargaining agreements.[6] But every other circuit court to

---

[6] The District Court concluded that *Barnes* was not binding because it viewed that precedent as being cabined to maintenance. *See Joyce*, 2016 WL 3566726, at *6 ("The

11

address the conflict between collectively bargained-for rights and seafarers' rights at common law has seen the issue differently than we did. Joyce's claim thus hinges on the continuing validity of *Barnes*.

### C.    *Reconsidering* Barnes

"It is the tradition of this court that the holding of a panel in a precedential opinion is binding on subsequent panels." Third Circuit I.O.P. 9.1. "We adhere strictly to that tradition[]" and will only depart "on a rare occasion." *In re Grossman's Inc.*, 607 F.3d 114, 117 (3d Cir. 2010) (en banc). Consideration by the entire court en banc is therefore required to overrule a prior panel's precedent, Third Circuit I.O.P. 9.1, and "[w]e do not overturn our precedents lightly." *Al-Sharif v. U.S. Citizenship & Immigration Servs.*, 734 F.3d 207, 212 (3d Cir. 2013) (en banc). We also recognize, however, that "*stare decisis* 'is not an inexorable command.'" *Id.* (quoting *Payne v. Tennessee*, 501 U.S. 808, 828 (1991)).

---

Court agrees with Defendant that *Barnes* does not govern Plaintiff's claim with respect to unearned wages."). That is not an unreasonable position, and we agree with Amicus Curiae that "the right to unpaid wages is different in some respects from the right to maintenance and cure." (Amicus Curiae Br. at 6.) We are not persuaded, however, that those differences would necessitate limiting *Barnes* (and our holding today) to maintenance. We therefore think that Joyce has the better of that particular argument and that, if we were not to overrule *Barnes*, its logic would militate strongly in his favor.

12

In general, "we decide cases before us based on our own examination of the issue, not on the views of other jurisdictions." *In re Grossman's*, 607 F.3d at 121. But, when we find that our reasoning has been met by "universal disapproval" by other jurisdictions, those contrary views may "impel us to consider whether the reasoning applied by our colleagues elsewhere is persuasive." *Id.* That was the case in *In re Grossman's*, where we reevaluated a test established for stays in bankruptcy cases. *Id.* at 119-20. The decision we were considering then had been called "one of the most criticized and least followed precedents" in the bankruptcy realm, *id.* at 120 (quoting *Firearms Imp. & Exp. Corp. v. United Capital Ins. Co. (In re Firearms Imp. & Exp. Corp.)*, 131 B.R. 1009, 1015 (Bankr. S.D. Fla. 1991)), and had been "uniformly" rejected by other courts. *Id.*

*Barnes* has not been met with the same vocal rejection, but, when it was decided, three other courts of appeals had already reached the opposite conclusion, holding that the rate of maintenance in a freely bargained-for union contract was binding on the seafarers who signed it. *Al-Zawkari v. Am. Steamship Co.*, 871 F.2d 585, 588 (6th Cir. 1989); *Macedo v. F/V Paul & Michelle*, 868 F.2d 519, 522 (1st Cir. 1989); *Gardiner*, 786 F.2d at 949-50. As already noted, the Court in *Barnes* recognized those decisions but rejected their reasoning. *See Barnes*, 900 F.2d at 632 ("[W]e will depart from the position of the First, Sixth and Ninth Circuits."). In the twenty-seven years since, every other circuit to consider the question has, in turn, rejected *Barnes* and adopted the majority position. *Ammar v. United States*, 342 F.3d 133, 146 (2d Cir. 2003); *Frederick v. Kirby Tankships, Inc.*, 205 F.3d 1277, 1291 (11th Cir. 2000); *Baldassaro v. United States*, 64 F.3d 206, 212 (5th Cir. 1995). And three circuits have

13

extended their holdings to cover not just maintenance but also unearned wage rates established in collective bargaining agreements. *See Padilla*, 721 F.3d at 82 ("[W]hile the entitlement to unearned wages arises under general maritime law, rates for unearned wages may be defined and modified in collective bargaining agreements[.]" (citing *Ammar*, 342 F.3d at 146-47)); *Cabrera Espinal v. Royal Caribbean Cruises, Ltd.*, 253 F.3d 629, 631 (11th Cir. 2001) ("[T]he remedies provided for in maritime law [including wages] may be altered although not abrogated by collective bargaining agreements." (citing *Frederick*, 205 F.3d at 1291)); *Lipscomb*, 83 F.3d at 1108 ("[T]he method for calculating the amount of maintenance, cure, and wages may be determined by the collective bargaining process[.]" (citing *Gardiner*, 786 F.2d at 949)). Our opinion in *Barnes* leaves us standing alone and suggests that a reevaluation of that decision is in order.

*Barnes* rested on the idea that common law protections for seafarers arose from the "traditional doctrine[s]" of maintenance and cure, and that there was "no basis" in the law to allow union contracts "to override [those] common law maritime right[s]" when they had not been expressly "preempted by the labor laws." *Barnes*, 900 F.2d at 640. But, as recognized by the Ninth Circuit, this country's "national labor policy is built on the premise that employees can bargain most effectively for improvements in wages, hours, and working conditions by pooling their economic strength and acting through freely chosen labor organizations." *Gardiner*, 786 F.2d at 948. Those policies favor honoring holistic contracts between "labor and management ... that will effectively regulate every aspect of their ... relationship ... from the most crucial to the most minute[.]" *Id.* at 948-49 (quotations and citations omitted).

14

We now agree that the "broad labor policies which undergird federal labor law, as well as the nature of the collective bargaining process, require adherence" to the terms of a collective bargaining agreement, including rates established for maintenance and unearned wages. *Frederick*, 205 F.3d at 1291. For that conclusion, we do not rely on the doctrine of preemption; rather, we recognize, as have our sister circuits, that "the need for judicial intervention to protect seamen has been substantially lessened[,]" *Ammar*, 342 F.3d at 146, and thus the common law basis for requiring courts to disregard the freely negotiated agreements of private parties and to refuse to enforce the terms of the collective bargaining agreement also carries substantially less force, *see Gardiner*, 786 F.2d at 948. Although maritime remedies cannot be abrogated, courts should not "lightly embrace the repudiation of contractual obligations enumerated in a collective bargaining agreement," *id.*, and Congress has clearly expressed that it is generally the role of private labor agreements, not courts, to "regulate all aspects of the complicated relationship" between employer and employee, *id.* at 949 (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 580 (1960)). That is not only the better outcome for shipping companies, which can plan with certainty what their responsibilities will be, but it is also better for seafarers, whose collective bargaining strength can negotiate more favorable employment terms and conditions. We are persuaded that piecemeal judicial review of "one of many elements ... over which the parties negotiate" discourages that back-and-forth process. *Id.* (citation omitted). Put differently, "[t]he adequacy of the maintenance [or overtime] rate should not be examined in isolation by the court because the determination of its adequacy in relation to

15

the whole scheme of benefits has already been made by the union and the seamen who voted for the contract." *Baldassaro*, 64 F.3d at 213 (quoting *Gardiner*, 786 F.2d at 949); *see also Gardiner*, 786 F.2d at 949 ("[T]he nature of the 'give and take' process of collective bargaining suggest[s] that acceptance of a particular package of benefits should be binding on the union members.").

With our course change today, we remove ourselves from "engaging in overt legislation of particular dollar figures" in union contracts, and instead "enforce privately negotiated contractual rates[.]" *Al-Zawkari*, 871 F.2d at 588. The majority position we adopt accepts the "modern reality" of unionized seafarers who negotiate for comprehensive contracts. *Ammar*, 342 F.3d at 146. At the start of this century, the Second Circuit recognized that the days when wary and "friendless" seafarers needed the protection of the common law had largely passed. *Id.* "[T]oday, 'most seamen are union members with a union-negotiated package of compensation and benefits of which the right to maintenance [and unearned wages] is a small component[.]'" *Id.* (quoting T. Schoenbaum, *Admiralty and Maritime Law* § 6-32, at 361 (2d ed. 1994)); *cf. Macedo*, 868 F.2d at 522 (recognizing that collective bargaining agreements are "highly approved generally" and that enforcing their limitations on maintenance is "quite different" from enforcing limitations negotiated by "an individual seaman"). Unionization has produced a "well-organized work force with sophisticated leaders who constantly press for better working conditions" and the need for judicially fashioned protection has "substantially lessened." *Ammar*, 342 F.3d at 146. Negotiated union contracts strike a balance by "encompassing a wide range of issues for which some provisions will result in greater

16

protection ... while others will result in less." *Cabrera Espinal*, 253 F.3d at 631 (citing *Frederick*, 205 F.3d at 1291). Enforcing union contracts as written respects the priorities that modern seafarers have expressed through arms-length and well-informed negotiations.[7]

---

[7] In considering the preemption question in *Barnes*, we recognized the modern reality that seafarers are "neither friendless nor improvident." 900 F.2d at 636. Yet we rejected the idea that collective bargaining agreements could replace common law rights. Our opinion was rooted in the understanding that "the Supreme Court has shown no inclination to depart from its long-established solicitude for seamen." *Id.* at 637. Just a few months later, however, the Supreme Court did place some bounds on that solicitude and acknowledged that when Congress "speak[s] directly" to maritime remedies, courts are limited in their ability "to supplement Congress' answer" by pointing to the special status of seamen. *Miles v. Apex Marine Corp.*, 498 U.S. 19, 31 (1990) (internal quotation marks omitted); *see id.* at 27 ("We no longer live in an era when seamen and their loved ones must look primarily to the courts as a source of substantive legal protection .... In this era, an admiralty court should look primarily to these legislative enactments for policy guidance."). So, while the Court has since reiterated that seafarers remain "wards of admiralty," *Atl. Sounding Co., Inc. v. Townsend*, 557 U.S. 404, 417 (2009), our departure from *Barnes* in favor of enforcement of the labor laws is consistent with the pronouncements of the Court as well as those of the courts of appeals. It also reflects an appreciation of the problems inherent in deciding piecemeal the terms of freely entered collective bargaining agreements.

The scope of our decision today makes the holding in *Barnes* untenable, so that unearned wages and maintenance are alike subject to modification by union contracts. *See, e.g.*, *Lipscomb*, 83 F.3d at 1108 ("[T]he method for calculating the amount of maintenance, cure, and wages may be determined by the collective bargaining process[.]"). That is logical given the shared common law origins of maintenance, cure, and unearned wages. *See Cabrera Espinal*, 253 F.3d at 631 ("General maritime law guarantees seamen: '(1) maintenance, which is a living allowance; (2) cure, which covers nursing and medical expenses; and (3) wages.'" (quoting Herbert R. Baer, *Admiralty Law of the Supreme Court* 6 (3d ed. 1979))).[8] Our holding thus overrules *Barnes* and extends that reversal to the case before us.

But we also adopt a backstop protection for seafarers, as prescribed by our sister circuits. Consistent with principles of contract law, a seafarer with a basis to allege that an entire collective bargaining agreement is, or the process whereby it was entered into was, "unfair or inadequate" may bring that complaint to court. *Gardiner*, 786 F.2d at 949. The Second Circuit implicitly made that point when it upheld a maintenance figure set in a union contract where there was no allegation "that [the] agreement was not a legitimately negotiated agreement, or that [the seafarer's] interests were not adequately represented in the negotiation process, or that the agreement as a whole is unfair." *Ammar*, 342 F.3d at 146. Other circuit courts have also stressed that protection. *See*

---

[8] We recognized in *Barnes* that "[t]he right to unearned wages ... has the same historical basis as maintenance and cure." 900 F.2d at 634 n.2.

18

*Frederick*, 205 F.3d at 1291 ("[A]s in *Baldassaro*[ *v. United States*] and *Gardiner*[ *v. Sea-Land Service, Inc.*], [the plaintiff] makes no allegations that the [collective bargaining agreement] as a whole is unfair or that the union did not adequately represent him."); *Baldassaro*, 64 F.3d at 213 ("As in *Gardiner*, there is no allegation in this case that the [collective bargaining agreement] as a whole is unfair or that this seaman was not adequately represented by the Union."). Joyce has not challenged the negotiation process or the contract in its entirety, so that backstop is not at issue here.

We note a significant further limitation on our ruling: maintenance, cure, and unearned wages are so deeply rooted in common law that, absent congressional action, they cannot be completely abrogated by contract. *See, e.g.*, *De Zon v. Am. President Lines, Ltd.*, 318 U.S. 660, 667 (1943) (recognizing that "no private agreement is competent to abrogate" the shipowner's duty to pay maintenance and cure); *Al-Zawkari*, 871 F.2d at 588 ("While the duty to provide maintenance cannot be *entirely* abrogated, as an implied contractual provision, the right to maintenance can be modified and defined by contract."); *Gardiner*, 786 F.2d at 948 ("Although the right to maintenance is presumed to exist because of its establishment at common law, its rate may be subject to the negotiation process."). We would look askance, then, at any collective bargaining agreement that purported to eliminate those rights. We need not wrestle with that limitation today, however, because we are satisfied that defining unearned wages without including overtime was, "in relation to the whole scheme of benefits[,]" *Gardiner*, 786 F.2d at 949, not a

complete abrogation of Joyce's common law right to wages.[9] *Cf. Barnes*, 900 F.2d at 645 (Lifland, J., dissenting) ("Collective bargaining has not abrogated the right when it clearly recognizes the right and places a dollar value on [it] ... in the context of ... bargaining over wages, hours and other terms and conditions of employment which results in a myriad of benefits appropriate to the maritime environment.").[10]

---

[9] We urge courts who are faced with the question of whether a right has been abrogated to consider the agreement holistically. A contract that limits the common law rights to maintenance, cure, and unearned wages is most likely to withstand scrutiny if it expressly recognizes those rights and indicates how the rates have been bargained for in the negotiation.

[10] We also emphasize that, consistent with our reasoning, our holding only applies to unionized seafarers. The collective bargaining process is such a benefit to unionized seafarers and shipowners that it warrants enforcing collective bargaining agreements that modify traditional maritime rights of maintenance, cure, and unearned wages. This rationale does not apply to modify those traditional rights of a non-unionized employee. The disparate treatment of unionized and non-unionized seafarers is not inequitable, *but cf. Gardiner*, 786 F.2d at 951 (Fletcher, J., dissenting) ("[U]nion seamen and non-union seamen working for the same employer might receive different maintenance rates."); rather, it reflects the different choices of free agents who are then differently situated.

**IV.    Conclusion**

It is the rare case in which we overrule our own precedent. But when our Court is in disagreement with every other circuit to consider a question, it can be wise to reconsider our prior reasoning. Having done so here, we overrule *Barnes v. Andover* and will enforce the rate of unearned wages set forth in the collective bargaining agreement between Joyce and Maersk. Consequently, we will affirm.[11]

---

[11] "We may affirm the district court on any ground supported by the record." *Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999).